Joe G. HARMS (Plaintiff), Respondent,

v.

James SIMKIN (Defendant), Appellant.

No. 29951.

St. Louis Court of Appeals.

Missouri.

April 1, 1959.

Motion for Rehearing or to Transfer
to Supreme Court Denied
April 30, 1959.

Marvin Q. Silver, St. Louis, for appellant.

James L. Nouss, Nouss, Bamburg & Gaebe, Clayton, for respondent.

HOUSER, Commissioner.

This is an action upon a written contract to pay for professional services as an architect.  Joe G. Harms, hereinafter

"Architect," filed a petition against James Simkin setting up a written contract to pay $6,500 for architectural services in connection with the remodeling and reconstruction of certain buildings on Euclid Avenue in St. Louis. Simkin's answer admitted the execution and terms of the contract but denied that Architect performed the services according to its terms. During the trial Simkin filed a counterclaim for damages resulting from Architect's alleged performance of the services in a negligent and inefficient manner. Following trial by jury the Circuit Court of the City of St. Louis entered judgment for Architect for $6,500 on his petition and against Simkin on his counterclaim, Simkin has appealed from the judgment.

■ The approved transcript shows that after the filing of an answer Attorney A withdrew as counsel for Simkin; that Attorney B entered his appearance as counsel for Simkin; that on March 8, 1957, the case was continued to June 10; that on June 6 Attorney B withdrew as counsel for Simkin by leave of court for the reason that Simkin did not pay ·his fee. On June 13 Simkin appeared in Assignment Division 1 without counsel, stated to the assignment judge that he "had to" represent himself, announced that he was not ready for trial, asked for and obtained leave to amend his application for continuance to read "that said Eugene Portman has not prepared this cause for trial for this date," and presented his motion for continuance. The court overruled the motion, stating that

> "* * * the Court has had experience with the defendant before, and that in at least one other case the defendant employed at least four other lawyers for the purpose of getting continuances, and as the cases were reached on the trial dockets the lawyers withdrew, and that has happened in this case."

Simkin denied dilatory tactics, claimed he had three lawyers and that each of them had been paid but that they had failed to prepare the case for trial. The assignment judge assigned the case "forthwith to Division 6 for trial" and directed Simkin to "go up in Division 6 and try your case." The cause proceeded to trial on June 13, 1957. Simkin appeared pro se in the impaneling of the jury, the making of opening statements, the examination and cross-examination of witnesses, the filing of a counterclaim, and the argument of the case to the jury. The trial took four days. There are four approved sections of transcript totaling 353 pages of record. A fifth document, consisting of an affidavit of four legal size sheets of single-spaced typewriting captioned "Supplemental Transcript of Proceedings had on June 13, 1957" has been filed in this court. It purports to be matter omitted from the transcript by reason of the inexperience and ignorance of Simkin—supposedly is a record of oral statements by Simkin to the judge of Division 6 protesting his unreadiness to go to trial, demanding the right to be represented by counsel, and pleading for delay in order to procure counsel and prepare for trial, together with statements of counsel for Architect objecting thereto and rulings by the court refusing to grant any further delay. This affidavit, prepared and filed here after the notice of appeal was filed, not stipulated by the parties and not ordered or directed by the trial court or by this court under the provisions of section 512.110, subd. 3 RSMo 1949, V.A.M.S. relating to corrections of omissions and the filing of supplemental transcripts, cannot be considered by this court. Hendershot v. Minich, Mo.Sup., 297 S.W.2d 403; Brown v. Stroeter, Mo.App., 263 S.W.2d 458.

On this appeal Simkin does not attack the judgment on the basis of the weight and sufficiency of the evidence, the propriety and correctness of the instructions, or "the merits of the cause as tried." The several points upon which Simkin relies for a reversal of the judgment raise the question whether Simkin was accorded a

fair trial, and seek a ruling on the question whether he was deprived of his rights and property without due process of law.

Simkin asserts that he was deprived of a fair trial by the action of the assignment judge in permitting Simkin's counsel to withdraw from the case immediately before the time the case was set for trial, without time to retain new counsel or prepare for trial, and in denying a continuance on that ground; in assigning the case to a division for trial without the assistance of counsel, and in requiring Simkin to act involuntarily as his own counsel. Citing Magerstadt v. La Forge, Mo.Sup., 303 S.W.2d 130, Simkin forcefully insists upon his right to be represented by counsel at all stages of the litigation. He brands the action of the assignment judge in allowing Simkin's counsel to withdraw one week before the trial as arbitrary and complains that as a result of being forced to try his case pro se, without experience in the trial of cases, he was prejudiced; that Simkin's adversary was an experienced lawyer who was given free rein, whereas Simkin fumbled and stumbled in his attempt to defend himself, with the result that there was no contest.

A lawyer who assumes an employment should not throw up the unfinished task to the detriment of his client, except for reasons of honor or self-respect, and having assumed an employment has a right to withdraw only for good cause. He may be warranted in withdrawing if the client deliberately disregards an obligation as to fees, in which event he must give his client due notice and allow him time within which to employ another lawyer. Supreme Court Rule 4.44, 42 V.A. M.S. Here Mr. Portman withdrew for good cause, namely, for failure to pay the lawyer's fee, and with the permission of the court, one week before the trial date. The record does not show that Simkin was not notified, in time, of his lawyer's action in withdrawing, or that he was unable financially to make satisfactory arrange-

ments with Mr. Portman, or that he tried to induce Mr. Portman to remain in the case, or that during the week allotted to him he made any effort to obtain the services of other counsel. The affidavit does indicate that Simkin had procured a Mr. Hamilton, who agreed to enter his appearance as his counsel if granted time for preparation, but we cannot consider this affidavit for the reasons heretofore given. The court did not err in permitting the withdrawal.

The mere fact that an attorney withdraws from a case does not give a party an absolute right to a continuance. Annotation, Continuance—Withdrawal of Counsel, 48 A.L.R.2d 1155, § 2. The decision whether to grant or deny a continuance on this ground rests largely in the discretion of the trial court, and although that discretion is judicial in nature and reviewable on appeal, every intendment is in favor of the court's ruling. Savings Finance Corp. v. Blair, Mo.App., 280 S.W.2d 675, loc. cit. 678. Whether there has been an abuse of discretion on the part of the court in directing that a trial proceed in the absence of an attorney for a party depends upon the particular facts and circumstances in the given case. Brown v. Stroeter, supra. According to the assignment judge's statement, which we accept, Simkin had employed a series of lawyers in this case for the purpose of procuring continuances by the withdrawal of lawyers as the case was reached on the trial docket. Simkin had employed the same dilatory tactics in another case before the same judge. We have had a similar experience. After the case reached this court Simkin's Attorney X filed two motions for additional time to file a transcript on appeal. Attorney X then filed a motion to withdraw on the ground that the check which Simkin gave him for his fee had been returned for insufficient funds. Attorney Y thereupon entered his appearance for Simkin and filed a third motion for additional time to file a transcript. Attorney Y then filed a motion to

withdraw on the ground that Simkin had not made financial arrangements for Y's fee. Simkin, appearing pro se, made an application for additional time to prepare and file a brief. When we denied this, present counsel for Simkin entered his appearance. Two different, successive lawyers in the trial court; three different, successive lawyers in the appellate court; four withdrawals of counsel, at least three for non-payment of fees. A defendant who employs a series of lawyers without making satisfactory financial arrangements for the payment of their fees, as a result of which he ·is never prepared for trial, cannot depend upon the courts regularly to postpone his case on the eve of the time set for trial on the ground that his counsel has withdrawn. He has only himself to blame if he is forced to go to trial without counsel. Inevitably a day of reckoning comes. By inattention to his case a party defendant may not be permitted to impede the orderly administration of justice and then complain that the court has acted arbitrarily in holding him to the consequences of his own neglect. If the rule were otherwise, a defendant could indefinitely avoid trial, and "there would be no end to the matter." 12 Am. Jur., Continuances, § 13, p. 456. June 13, 1957, was the day of reckoning for Simkin. The assignment judge judicially weighed Simkin's rights in the light of the attending conditions and circumstances, and exercised his judgment properly and within the bounds of judicial discretion. Brown v. Stroeter, supra; Savings Finance Corp. v. Blair, supra. There was no error either in overruling Simkin's application for a continuance or in assigning the case to a division for trial, or in forcing him to trial without counsel.

■ Simkin complains of the conduct of the trial judge, contending that he made improper comments, remarks and inquiries and engaged in abuse of and concerning Simkin reflecting upon his character, credibility and integrity, thereby prejudicing the jury against Simkin, as a result of which he was deprived of a fair trial and deprived of his rights and properties without due process of law. The constitutional question, sought to be raised for the first time in appellant's brief, has not been preserved for review since it was not raised at the first available opportunity and was not presented in the motion for a new trial. City of St. Louis v. Butler Co., 358 Mo. 1221, 219 S.W.2d 372.

The question whether Simkin was deprived of a fair trial by the actions and conduct of the trial judge is squarely before us and is a matter of serious concern. Simkin claims that on numerous occasions the trial judge "berated and scolded the defendant for his perhaps serious, but certainly excusable, errors;" that his comments and remarks were "numerous and prejudicial." The following incidents occurred in the presence of the jury, during the cross-examination of Architect by Simkin, who was conducting his defense pro se:

Architect testified that he employed a heating engineer to assist him and paid him 3% of the amount of the heating contract. In framing a question Simkin quoted Architect as having testified directly to the opposite, namely, that Architect had received 3% from the engineer. Upon objection the trial judge stated to Simkin that the jury had heard the testimony; that there was no such testimony; that what Simkin was saying "is an entirely different thing. You have twelve people, and I suggest you are not going to fool all twelve of those people. They know what is being said. You are putting yourself in bad with the people you want to help you." When Simkin acknowledged his mistake and apologized for the error the court said, "That is not a little one. That is a home run with the bases loaded. Go ahead." Simkin insisted that Architect prove that he paid the heating engineer by producing documentary evidence. The next day, Architect not having brought the documentary evidence to court as Simkin had suggested, Simkin said, "Now, if

the Court will allow, and the Court knows I have a right, * * *" whereupon the court interrupted, saying:

"The Court: No, don't start that.

"Mr. Simkin: I'm trying to do my best to qualify the witness.

"The Court: Let me suggest something to you. I'm not on trial here, and I'm not going to be tried by you or anybody in the Court Room. You try your case but leave me out of it.

"Mr. Simkin: There's nothing personal about it.

"The Court: The Court will tell you. Don't you tell me, sir."

Simkin contended that the payment of Architect's fee depended upon the obtaining of proper financing for the project. Simkin asked Architect if the question of the dependency of Architect's fee upon obtaining financing was discussed, and whether there was discussion that if there was a foreclosure of a prior mortgage on the property Architect's fee would be wiped out. In ruling on an objection the court volunteered the following:

"The Court: I will make this comment, it would be a rather simplified way of wiping out a debt, get the man to work for nothing, if you can do it that easy."

Later Architect testified that Simkin refused a suggestion that the Architect's fee be included in Simkin's financing. Simkin characterized the answer as untrue, saying "That is untrue." The court, in the absence of objection, said:

"Mr. Simkin, I am not going to be harsh with you and won't scold, but I won't permit you to stand in my court and in the presence of me and the jury and accuse a witness of committing perjury. Don't do that. I will be forced to do something I won't want to do. I don't want to be harsh but want to be courteous and considerate

as I can be but I won't let a lawyer do that, sir, and I won't let you do that. Now apologize to this man for having accused him of committing perjury and lying, don't do that. I have a place to put you if you do.

"Mr. Simkin: Your Honor—

"The Court: We are all here and are United States citizens, and I will accord you, in fact, am giving you a little more rope than I would give a lawyer, but don't accuse a witness of committing perjury in front of me unless you have proof beyond a reasonable doubt that he has. Go ahead now and ask your questions. We will be all right, and I won't hold that against you, when I told you what I am going to do. That is the end of that."

Simkin, in his cross-examination of Architect, suggested that the latter could have filed a mechanic's lien for his fee, whereupon the court made this observation: "I am glad to have you tell me what the law is." Architect denied that the mechanic's lien law is applicable to architects. Simkin indicated that he had relied on good authority that it was applicable, whereupon the court volunteered the following:

"Somebody gave you the wrong information, Mr. Simkin. I don't know who did it. I just left the division the first of January, 1957 where for twelve months I ruled on those particular types of cases and lots of them, and we have a statute.

"Q. (by Mr. Simkin) Did you—

"The Court: Laborers, materialmen, and mechanics, and an architect is not listed, not classified, as any one of those. Lumbermen, plasterers, carpenters, laborers, materialmen, and mechanics, who do something in a building or on the sidewalk to improve the property, not architects who furnish the plan for those people to do it with."

Architect testified that he could tell whether concrete was good or bad by look-

ing at it. Simkin, contending that the concrete should have been tested in a laboratory, compared the visual testing of concrete with the examination by a doctor of a patient by visual means, saying that a doctor "has a number of instruments to help you determine whether the patient is in good or bad shape. Sometimes a rosy-cheeked person can be in bad shape." The court interrupted, saying, "Let's leave the hospitals out of the lawsuit. Let's go back to the Court Room.

"Mr. Simkin: I am sorry, I stand corrected.

"The Court: I am not scolding you. I want to bring you back in the infield out of the outfield.

"Mr. Simkin: It was improper and I am grateful to your Honor. As I told you, I am no expert in this—"

Simkin vigorously contended that he had never "accepted" the building and repeatedly objected to the use by Architect of the term in testifying that there was a final inspection and acceptance of the building. These several objections were overruled by the court with the comment "It might be an item for the jury to determine." Then the court, interesting himself in the question of acceptance or non-acceptance, took the interrogation out of the hands of Architect's counsel, as follows:

"The Court: Who is renting it now, getting the rent out of it?

"Mr. Simkin: The stores are vacant, with the exception of one small store, which the tenant refuses to pay rent on account of the constant water being in the basement. With the exception of the first month's rent he hasn't paid any since.

"Mr. Kelly (Architect's attorney): I think the Court wanted to know about the entire building, didn't you, Your Honor? What about the apartments?

"Mr. Simkin: The apartments—

"The Court: *Since February 16, 1956, you have permitted tenants to go in and occupy those apartments?*

"Mr. Simkin: The apartments are occupied with the exception of three, the stores are not.

"The Court: *Who permitted those people that are occupying it to go in there?*

"Mr. Simkin: Well, they were available for rental and I did.

"The Court: I didn't ask you whether they were available for rental, Mr. Simkin. *Someone gave them permission to go into those premises, didn't they?*

"Mr. Simkin: Yes.

"The Court: *Who gave them that permission?*

"Mr. Simkin: I did.

"The Court: All right. Go ahead, you may examine the witness."

In answer to a question whether, on inspection, Architect found the building, with the exception of two items, in perfect accord with plans and specifications and changes agreed upon. Architect testified that he, the general contractor and Simkin went over the building thoroughly and that "the workmanship was real good." Simkin objected that he had not asked whether the building was good or bad, but whether Architect was satisfied with everything with the exception of the two items. The court then stated:

"I will overrule the objection and let him explain his answer. I will give you this explanation for my ruling. It won't convince you but it will indicate to you why I rule the way I do. We have a man here (referring to the plaintiff, who was on the stand) that is skilled, a man that is educated in the manner much the same way that a doctor is educated about the human system. He understands it and he knows

more about the building than the layman of us do, either those on the jury or me sitting on the bench. So, I am letting him give his opinion on it, the same as I would let a doctor do, in giving his opinion as to whether a bone has healed properly or improperly. That's the purpose and that's why I rule as I do, to give the jury the benefit of the opinion of a man who is more experienced than all the rest of us put together. That's why I do that.

"Mr. Simkin: Your Honor, may I ask you a question in that regard?

"The Court: There is no use to question me. I am not permitted to answer. I can't take the witness stand in the trial of a case in which I'm sitting as the judge."

At one stage of the trial Simkin moved for an adjournment until the next morning on the ground that he had served a subpoena duces tecum on Architect to produce certain records. The court, in the presence of the jury, told Simkin that he would not have to serve any subpoena if he would communicate with Architect's attorney and indicate to him pertinent and relevant matters that he might want; that the attorney for Architect would cause the production of evidence upon notice. Architect's attorney then indicated that he and his client would gladly produce records "if we knew what he wanted;" that although they had been in trial "since last Thursday" Simkin had never asked them to produce anything other than a couple of matters, which they produced voluntarily and that he would do the same thing in the matter now before the court. The court indicated that the trial would have to proceed through the rest of the afternoon without adjournment. A long colloquy between court and Simkin and counsel for Architect ensued, in the course of which the court indicated that he might have to "impose" upon the attorney for Architect "a little bit," to which the attorney responded, "All right, Your Honor." The court asked Simkin precisely what

documents were wanted, and said to Simkin:

"I don't want to cut you off, but we are just on a treadmill here now and the first thing you know you are going to accomplish the purpose indirectly that I tell you you can't accomplish directly and I'm not going to let you do that. You want to dally this thing along until tomorrow morning and you are not going to do it. Now, what I'm trying to get you to indicate now is to tell Mr. Kelly in front of this jury, and in open court, what it is, in addition to these three checks, that you have here in the court room, what else it is that you want and I am sure that Mr. Kelly will bring it in here for you and tell his client to bring it in here for you. Just chop it down here, now, and tell us what you want."

Simkin finally indicated the three things he wanted and then asked the court:

"Mr. Simkin: May I give you the reason for my asking?

"The Court: You don't need a reason. You want these items. Now, you don't have to tell me why. * * *

"Mr. Simkin: I wish you would give me the opportunity to explain why I'm asking that.

"The Court: I don't want to know why you are asking. The law gives you the right to have them. You don't have to tell me why you want them, * * *."

Simkin, seeking to show that Architect had not complied with an article of the contract which required him to draft forms of the proposals for the general and subcontractors, elicited the answer that Architect had not prepared these forms. Architect then made a voluntary statement that Simkin "wouldn't let him;" that Simkin chose not to have Architect draw the forms. Simkin stated to the court that he had the right to object to that form of answer, and

that if his objection was overruled he had the right to have "proof * * * I have the right to ask the witness to present proof." Thereupon the court said:

"Maybe I'm under a misapprehension but I thought I had been listening to proof since last Thursday in this case and I thought the jury had, too. I don't know what you mean by proof. *The witness on the stand is a witness testifying under oath. If that isn't some proof to the jury, then we have been wasting a lot of time here.*"

Architect read a letter from the general contractor to Simkin relating to additional work. Architect was asked whether he ever received a copy of that letter, to which he answered in the negative. Simkin objected on the ground that he was placed in a position where Architect was presenting evidence which he had no chance of refuting, to which the court said:

"I will overrule the objection and I would say this to you: This case has been on trial here since last Thursday and when you go out hunting you are always supposed to take your ammunition with you. If you want any witnesses subpoenaed I tender you the full process of this Court and the Deputy Sheriff downstairs will give you all the service we have at our command.

"Mr. Simkin: Your Honor, this letter—

"The Court: I'm giving you what you ask for as ample opportunity but I believe when you go into a battle you should be prepared to fire at anything that happens."

Finally, the court admonished Simkin as follows:

"If you have some questions, you ask that question and don't make a speech with a lot of stuff that you say is so and so and this is important and that is important. We have twelve people over here to decide that. I have given you a lot of latitude, Mr. Simkin."

In the eyes of the jury the trial judge is the epitome of justice and wisdom. His influence upon the jurors is immense. A trial judge is obligated to maintain strict impartiality as between the adverse parties to a lawsuit. Jurors are quick to detect and respond to his slightest inclination toward or against either side of a lawsuit; to condemn the side which he condemns and to approve the party litigant or the cause upon which he smiles. Wright v. Richmond, 21 Mo.App. 76. It is easy for a trial judge, unintentionally, to prejudice a jury for or against one party or another. He must be extremely cautious in his comments, considerate in his rulings, and thoughtful, patient and forbearing in his conduct. Any appearance of partiality, favoritism or persuasion one way or the other is strictly to be eschewed. He must not embarrass or make accusations against either party or his attorney. He must not make comments which could arouse contempt for or suspicion of any party. He must not emphasize but should minimize his belief that a party is relying upon a mistaken view or misunderstanding of the law, or that his cause, defense or position on an issue is untenable or without foundation. He should not say that a party is attempting to deceive the jury, or infer that a party cannot be reasoned with. He must sedulously avoid any appearance of heat or hostility as to any party or attorney. He must avoid conveying any impression or suspicion either that he attaches weight to, or discounts, the testimony of any party or witness. Wair v. American Car & Foundry Co., Mo.App., 285 S.W. 155. He must refrain from expressing any opinion, directly or indirectly, upon any contested issue upon which the jury ultimately must pass. He should not assume the position of an advocate by taking over the examination of a witness in order to establish a point destructive of a position taken by a party. Bova v. Bova, Mo.App., 135 S.W.2d 384, and see Fleetwood v. Milwaukee Mechanics Ins. Co., Mo.App., 220 S.W.2d 614; 88 C.J.S. Trial § 51.

 In this case we appreciate the exasperating and vexing situation with which the trial judge was confronted. He was forced to deal with an aggressive, verbose, persistent, argumentative and provocative layman acting pro se, without the benefit of counsel, untrained in legal procedure, unaccustomed to frame proper questions, seeking and often obtaining an advantage by "loading" questions with statements of fact favorable to the cross-examiner, engaging in repetition and tactics which, wittingly or unwittingly, extended the trial of a relatively simple issue over a four-day period. Under these circumstances it was difficult to maintain that fine balance of impartiality, neutrality and objectivity required. Generally during the course of the trial the court exhibited patience, fairness, consideration for and a conciliatory attitude toward Simkin. The judge explained the procedure open to Simkin, offered to permit Simkin to make objections when objections would have been appropriate, informed and offered Simkin the use of the subpoena process of the court and allowed Simkin to file a counterclaim out of time, etc. Knowing the exemplary character and unimpeachable integrity of the trial judge we know that he did not intend to prejudice Simkin before the jury, but on the contrary tried to avoid that very thing. In spite of his good intentions, however, the trial judge administered antidotes that were stronger than the poison and unfortunately passed the limits and bounds of judicial propriety. In his zeal to correct errors made by Simkin and in his effort to keep the trial on an even keel, he inadvertently materially prejudiced Simkin's position before the jury in the respects which we have mentioned.

It is, therefore, the recommendation of the Commissioner that the judgment of the circuit court be reversed and that the cause be remanded for a new trial.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, reversed and the cause remanded for a new trial.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.