Mary **EICHELBERGER,**
**Plaintiff-Respondent,**

v.

**BARNES HOSPITAL,**
**Defendant-Appellant.**

No. 45438.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 21, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 1983.

Application to Transfer Denied
Sept. 20, 1983.

Mo. 497, 79 S.W.2d 109 (Mo.1934).

John C. Shepherd, Ken Bean, St. Louis, for defendant-appellant.

James Logan, St. Louis, for plaintiff-respondent.

DOWD, Judge.

Plaintiff Mary Eichelberger instituted this medical malpractice suit against Barnes Hospital alleging that defendant through its employee, Doctor Hirschel, negligently punctured the plaintiff's right lung while attempting to perform a medical procedure known as a subclavian stick.

The court overruled defendant's motion for a directed verdict at the close of all the evidence, and the case was submitted to the jury. The jury rendered a verdict in favor of the plaintiff in the amount of $50,000. Thereafter, the court overruled defendant's motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial. This appeal followed. We affirm.

Mrs. Eichelberger, a sixty year old woman at the time of the trial, has an extensive medical history. In 1946, she developed tuberculosis and was confined to a sanitarium for fifteen months. In order to treat the tuberculosis the doctors there collapsed her left lung. Soon after this therapy, plaintiff was released with no further difficulty with tuberculosis.

In the 1950s Mrs. Eichelberger developed a condition known as Chron's Disease which inflames the small and large intestines and affects the body's ability to absorb nutrition. Between 1958 and the date of trial, plaintiff experienced periodic flare-ups of Chron's Disease which forced her to be hospitalized twelve times.

On July 3, 1977, plaintiff's condition of Chron's Disease rapidly deteriorated and she was taken to the emergency room at Barnes Hospital. Doctor Bernard Hirschel, a resident in the emergency room treated Mrs. Eichelberger, who weighed 75 pounds at the time of her admission. Doctor Hirschel testified that due to her dehydrated state, plaintiff needed fluids and calories but because of the Chron's Disease, it was impossible to give her these fluids orally. Doctor Hirschel testified that he first attempted to insert an intravenous line into her arm but he was unsuccessful in locating the vein because of her substantial weight loss. According to the doctor, he then explained to Mrs. Eichelberger that the best

alternative method of giving calories was through what is known as a subclavian stick, which requires insertion of a catheter under the collarbone and into the subclavian vein. This procedure involves using a small anesthetic needle to numb the area and locate the vein. Once the vein is located a much large needle is then placed into the vein and a catheter is placed through the needle and is attached via a plastic line to the caloric solution.

First, Doctor Hirschel attempted to locate the subclavian vein on plaintiff's left side— the same side as her partially collapsed tuberculoid lung. However, the doctor could not find the vein so he attempted the same procedure on the right side. While using the small anesthetic needle to locate the vein, Doctor Hirschel punctured the pleural space around plaintiff's right lung. Mrs. Eichelberger immediately complained of shortness of breath at which point an x-ray confirmed that she had indeed suffered a pneumothorax, or puncture of the pleural space around the lung. A surgical intern who was present in the emergency room inserted a chest tube to reinflate the lung. She later was taken to the intensive care unit for nine days and to a regular floor where she remained for 26 additional days.

Mrs. Eichelberger testified that she lost consciousness after the pneumothorax and did not awake until sometime later. The plaintiff's two children testified that the hospital called a "code blue" emergency after the puncture and a large team of physicians and nurses worked on their mother during this time. They said she looked as though she was deprived of oxygen. After the hospitalization there was testimony that plaintiff complained of shortness of breath, inability to walk up and down stairs, and an inability to do her housework.

There are two complications with performing a subclavian stick. One is bleeding and the other is a pneumothorax, or puncture of the pleural space around the lung. Mrs. Eichelberger testified that during her treatment in the emergency room the risks of the subclavian stick were not discussed with her. Doctor Hirschel did not specifi-

cally remember telling her about the two complications but he also did not recall departing from his customary practice of informing patients of the risks of this procedure.

All six of the physicians who testified for defendant, Barnes Hospital, agreed that the plaintiff, if she was not, should have been informed of the risks of the subclavian stick. They also all agreed that the mere fact that a pneumothorax occurs during a subclavian feeding does not indicate that the physician was not performing up to the standards of good medical practice. These doctors also all individually found no evidence of any present pulmonary problems which could be related to the pneumothorax at Barnes Hospital in 1977.

The expert testimony offered by the plaintiff was that of Doctor Sharon Woodruff. Doctor Woodruff received her training at the Washington University School of Medicine, Jewish Hospital, and she served as a resident on the staff at Barnes Hospital. Doctor Woodruff testified that she was an expert in internal medicine, neurology, psychiatry, and surgery. In July of 1977, Doctor Woodruff surrendered her license because of a firearms conviction so at the time of trial she was not licensed to practice medicine in any state.

Doctor Woodruff testified that the "treatment of choice" to administer fluids was a venous cutdown which would involve the insertion of an intravenous line into the lower part of the leg. In fact, the venous cutdown was the "procedure of choice" at Barnes Hospital when she was on staff there because it enabled physicians to avoid the known risks of a subclavian stick. According to Doctor Woodruff, both the act of puncturing the lung when attempting a subclavian stick and the failure to inform the plaintiff of the risks in performing a subclavian stick constituted a failure to exercise that degree of care, skill and diligence that is exercised by a careful and prudent physician under the same or similar circumstances.

In its first point, appellant, Barnes Hospital, asserts that the trial court committed

prejudicial error by admitting into evidence Doctor Woodruff's testimony as a medical expert because she was not competent to render an expert medical opinion due to her felony conviction and lack of a medical license. Appellant argues that it should be a prerequisite that the expert be licensed to practice before being allowed to testify.

An expert witness is one who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons who have no particular training are incapable of forming an accurate opinion of or deducing correct conclusions therefrom. *Giambelluca v. Missouri Pacific Railroad Company,* 320 S.W.2d 457, 463 (Mo.1959).

The determination of an expert witness' qualifications in the field in which his testimony is sought rests in the first instance in the sound discretion of the trial court and its decision in that respect should not be set aside in the absence of a showing of abuse of discretion. *Edwards v. Rudowicz,* 368 S.W.2d 503, 506 (Mo.App.1963).

Appellant contends that the trial court lacked discretion in permitting an unlicensed doctor to testify. Appellant argues that Doctor Woodruff was incompetent to testify as a matter of law because of the lack of a medical license. For authority appellant cites the case of *Gee v. Bess,* 176 S.W.2d 516, 523 (Mo.App.1943), where the court held that although Doctor Bess had been suspended by both the American Medical Association and the Sedalia Association, he was a licensed physician and therefore competent to testify. Appellant argues that because *Gee* held that a licensed physician was a competent witness the trial court was without discretion to rule on the competency of a doctor whose license had been suspended. We disagree. We believe the court in *Gee* was merely following precedent by giving deference to the decision of the trial court in refusing to review the matter absent a showing of an abuse of discretion. We do not believe that the rule for medical doctors should differ from the normal rule on competency of expert witnesses. The expert witness must have sufficient skill, knowledge, or experience in the field or calling as to make it appear that his opinion will probably aid the trier in his search for the truth. See generally, *Edwards v. Rudowicz,* 368 S.W.2d 503 (Mo. App.1963).

Appellant raised no objection to the competency of Doctor Woodruff as a physician and, in fact, she received part of her training and served on the staff at Barnes Hospital. Appellant's only concern reflected the fact that Doctor Woodruff was a convicted felon who had surrendered her license to practice medicine. A person who has been convicted of a criminal offense is a competent witness, but her conviction may be proved to affect her credibility either by the record or by cross-examination. *State v. Washington,* 383 S.W.2d 518, 523 (Mo.1964). We do not find that the trial court abused its discretion by allowing Doctor Woodruff to testify as an expert witness. Appellant's first point is therefore denied.

Appellant also contends the trial court erred in denying its motion for a directed verdict because there was no substantial evidence to support plaintiff's claim of negligence. We find that the motion was properly denied by the trial court.

Whenever an assignment of error is based upon the trial court's refusal to direct a verdict, the appellate court will review the evidence presented at trial and will determine whether or not the plaintiff has introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery. If the plaintiff has introduced such substantial evidence, the trial court will not be found to have committed reversible error. See generally, *Brawley v. Esterly,* 267 S.W.2d 655, 659 (Mo.1954). In reaching this determination, we must review the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case. *Mincielli v. Sloan's Moving and Storage Company,* 303 S.W.2d 17, 19 (Mo.1957). If reasonable minds can

draw different conclusions from the facts, the questions of negligence and causation are for the jury and a directed verdict is not proper. *Baker v. Brinker,* 585 S.W.2d 256, 259 (Mo.App.1979).

Both sides agree that in order for plaintiff to prevail, she must establish that 1) the defendant's employee negligently punctured plaintiff's right lung or failed to warn her of the risks of the procedure and 2) as a result of such negligence she sustained damage.

■ We find that in reviewing the evidence in the light most favorable to the plaintiff, there was substantial evidence of negligence. Doctor Woodruff, plaintiff's expert witness, testified that both the act of puncturing the lung while attempting a subclavian stick and the failure to inform the plaintiff of the risks involved in performing a subclavian stick constitute a failure to exercise that degree of skill, care and diligence that is exercised by a careful and prudent physician under the same or similar circumstances. Doctor Woodruff also testified that as a result of such negligence, plaintiff suffered hypoxia or loss of oxygen to the brain which resulted in memory loss.

Appellant, without citing any authority, argues that expert testimony based upon no review of the medical record or an examination of the plaintiff is wholly unworthy of belief and that as a matter of law it should not be considered towards meeting plaintiff's burden of establishing negligence and causation.

■ Appellant's objection actually goes to Doctor Woodruff's competency to testify. At trial, although appellant did object to Doctor Woodruff's competency based on the fact that she was an unlicensed physician, appellant made no objection as to her competency and the validity of her testimony based on her failure to review plaintiff's medical records. If there was no objection during the trial, none may be interposed on appeal. Therefore, this issue is not preserved. *Galovich v. Hertz Corporation,* 513 S.W.2d 325, 336 (Mo.1974).

■ With respect to the duty to warn, appellant contends that the duty only applies when the risk of some adverse side effect is significant. Although the frequency of occurrence and extent of danger are factors to be considered by doctors in their testimony, the test is what a reasonable medical practitioner would do under the same or similar circumstances. *Aiken v. Clary,* 396 S.W.2d 668, 676 (Mo.1965). The question of what disclosure of risks incident to proposed treatment should be made in a particular situation involves medical judgment, and expert testimony thereon should be required in malpractice cases. *Aiken v. Clary* 396 S.W.2d at 674. In the trial, the expert testimony for both sides was in general agreement that there was a duty to warn the plaintiff of the risks incident to the performance of a subclavian stick. We therefore defer to the opinion of the medical experts and to the finding of the jury as to whether or not there was a failure to adhere to a minimum standard of reasonable medical care.

■ Finally, appellant is concerned over the fact that the expert opinion of Doctor Woodruff was contradicted by the opinions of their own experts. After reviewing the record, we find that reasonable minds could have drawn different conclusions from the facts and therefore the questions of negligence and causation are for the jury and a directed verdict would not have been proper. Therefore, this point is denied.

■ Appellant also contends that verdict directing instruction number seven incorrectly referred to the puncture of plaintiff's "left" lung when in fact, her "right" lung was punctured. Appellant, in its post-trial motion, asserted that the foregoing instruction was improper as it was not supported by the evidence. We agree that any issue submitted to the jury must be supported by evidence from which the jury could reasonably find such issue. *Baker v. Brinker,* 585 S.W.2d 256, 258 (Mo.App.1979). In the instant case, the issue of whether plaintiff's lung was punctured during the subclavian stick was undisputedly supported by the evidence. In fact, appellant

**706**

admits that its employee punctured Mrs. Eichelberger's lung. The problem with instruction number seven is that it mistakenly referred to plaintiff's "left" lung when in fact her "right" lung was the one punctured.

Whether an instruction is confusing depends upon how it would be understood by a jury of ordinarily intelligent laymen. *Breshears v. Union Electric Company,* 373 S.W.2d 948, 954 (Mo.1964). During the trial, there was no dispute over the fact that Doctor Hirschel first attempted to perform the subclavian stick on plaintiff's left tuberculoid lung, and that he then moved to her good side, and subsequently punctured her right lung. We find that the jury was not confused over the fact that plaintiff's lung was indeed punctured. Rather, the jury's confusion pertained to whether the issue of negligence is directed upon the finding that the lung was punctured, as evidenced in the question submitted to the judge:

> Dear Judge, there is confusion over Instruction No. 7 concerning the first item to believe. As quoted it says "defendant's employee punctured plaintiff's left lung." This is a fact we all agree with this—however do you mean in this instruction that he punctured the left lung and through *neglect* he punctured the lung.

The test is whether the instruction is substantially correct. We are not convinced that the jury was misled or confused in this case. *Rieke v. Brodof,* 501 S.W.2d 66, 68 (Mo.App.1973). We find that this inaccurate statement of the facts in the instruction did not have an important bearing on the jury's view of the case. Therefore, this error was not prejudicial. See generally *Larkin v. City of Minneapolis,* 112 Minn. 311, 127 N.W. 1129 (1910).

Appellant also contends the court erred in submitting plaintiff's verdict directing instruction number six which reads as follows:

> The term "negligent" or "negligence" as used in these instructions means the failure to use that degree of skill and learn-ing ordinarily used under the same or similar circumstances by members of defendant's *employees* profession. (emphasis ours).

This instruction was patterned after 11.06 MAI3d [1978 Revision]. Appellant cites as error the insertion by plaintiff of the word "employees" in the approved instruction because this did not accurately state the law of negligence as it pertains to hospital corporations.

Instruction number six is a definition of the terms negligent and negligence as used in plaintiff's verdict directing instruction number seven. According to the notes following 11.06 MAI3d [1978 Revision], this instruction (11.06) should be used when a physician's or surgeon's negligence is in issue.

Appellant is correct that there is no specific Missouri Approved Instruction for hospital corporations. However, a corporation is an artificial being and can only act by agents, and it is responsible for the acts of its agents when done in the exercise of its agency. *Globe Indemnity Co. v. First National Bank in St. Louis,* 133 S.W.2d 1066, 1071 (Mo.App.1939). Consequently, it is the negligence of the agent of the corporation which defines the law of negligence as it pertains to hospital corporations. We therefore find that it was not erroneous to insert the word "employees" in 11.06 MAI.

Appellant also contends that the testimony showed that numerous persons at the hospital attended to plaintiff and that therefore this instruction amounted to a roving commission and did not give the jury any guidance as to which employees were the subject of criticism or what their particular profession was.

This contention fails because all the evidence and arguments clearly pinpoint the physician Doctor Hirschel as the employee whose conduct is at issue in this case. There would be no basis for confusion by the jury. Consequently, we find appellant's argument to be without merit.

In its fifth point appellant contends the trial court erred in giving verdict directing instruction number eight claiming there was no evidence to support plaintiff's claim for future damages. Said instruction provides:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe she sustained *and is reasonably certain to sustain in the future* as a direct result of the conduct that defendant has submitted in Instruction No. 7. (emphasis ours).

This is MAI 4.01. In the approved form, the words "and is reasonably certain to sustain in the future" are placed in brackets with the appended footnote, "this may be added if supported by the evidence."

■■■ On direct examination, plaintiff's expert witness, Doctor Woodruff testified that hypoxia with memory loss was a permanent complication suffered by plaintiff as a result of the lung puncture. By definition, permanent complications are damages which will be suffered in the future. Mrs. Eichelberger will forever be stricken with memory loss. Accordingly, we find that both the fact of plaintiff's permanent memory loss and its causal connection to the incident were sufficiently supported by the evidence to warrant the giving of a future damage instruction. *Jones v. Allen,* 473 S.W.2d 763, 766 (Mo. App.1971).

Appellant further contends the trial court erred in overruling its first motion for mistrial when during direct testimony the plaintiff became emotional and tearful and stated she did not like to be seen in public wearing her oxygen appartus. It is our judgment that the trial judge properly denied the motion.

■■■ Although emotional demonstrations by parties to a personal injury action such as crying should be avoided, the prejudicial effect thereof is a matter to be determined by the trial court in the exercise of its sound discretion. *Walton v. United States Steel Corporation,* 362 S.W.2d 617,

626 (Mo.1962). The matter of determining whether the emotional display engendered passion and prejudice on the part of the jury is something which we also believe should be left largely to the discretion of the trial court. Absent a manifest abuse of that discretion the appellate court should not interfere. *Hoene v. Associated Dry Goods Corporation,* 487 S.W.2d 479, 485 (Mo. 1972).

■■■ The trial court heard and observed the matters and was aware of the circumstances and the general atmosphere of the trial. We see nothing to indicate the trial court abused its discretion in failing to grant the defendant a new trial. Therefore, the point is denied.

In his closing remarks to the jury before they were dismissed for lunch, the trial judge stated:

Ladies and gentlemen, this case is now in your hands, but before you start deliberating, in view of the hour, we are going to suggest that you might want to go to lunch and we will set a time for you to get back to the juryroom. Two o'clock. Don't discuss the case at all until all twelve of you are present. Now some of you may get back before that. *Some of you may only have the apple that keeps the doctor away, I don't know.* (emphasis ours).

■■■ The defendant again moved for a mistrial maintaining the comments by the judge made it impossible for the jury to render a fair verdict. The motion was denied by the trial court. We agree that a trial judge is obligated to maintain strict impartiality as between the adverse parties to a law suit. *Harms v. Simkin,* 322 S.W.2d 930, 938 (Mo.App.1959). However, under these circumstances we find that the phrase was totally innocuous and did not prejudice or influence the jury in any way. The comment was made in the informal setting of allowing the jury to go to lunch prior to returning for deliberation. Further, the words are themselves not derogatory to hospitals or doctors but are merely a commonly used saying. Therefore, we find that the decision to deny the motion for mistrial was

made in the sound discretion of the trial court and was not an abuse of discretion. *Yust v. Link,* 569 S.W.2d 236, 239 (Mo.App. 1978).

Finally, appellant asserts that the $50,000 verdict was so excessive as to show passion and prejudice on the part of the jury because there was no competent evidence of any injuries or complications resulting from the alleged act of negligence. Although an appellate court has the authority to determine as a matter of law that a verdict exceeds the maximum amount which the evidence will support, the assessment of damages is primarily the function of the jury whose duty it is to award such sum as reasonably will compensate for the injuries sustained. *Gathright v. Pendegraft,* 433 S.W.2d 299, 317 (Mo.1968).

In the context of verdicts, the term excessive has been interpreted as being that which is of such a magnitude that it shocks the conscience of the court. *Green v. Crunden Martin Mfg. Co.,* 575 S.W.2d 930, 934 (Mo.App.1978). An appellate review of an alleged excessive verdict is limited to a consideration of the evidence which supports the verdict excluding that which disaffirms it. *Strake v. R.J. Reynolds Tobacco Company,* 539 S.W.2d 715, 719 (Mo.App.1976).

A review of the record reveals that plaintiff's expert witness testified that Mrs. Eichelberger suffered permanent damage as a result of the defendant's negligence. Doctor Woodruff explained that memory loss was a permanent complication of the pneumothorax in this case and future medical care for this was a real possibility. "Many times the initial damage with hypoxia with something like memory deficit is not apparent initially. It may take several years before the full extent of the problem is found ... [And the medical treatment rendered to correct this] could be anything from medication, psychotherapy, hospitalization, eventual institutionalization."

Prior to this testimony, the evidence established that Mrs. Eichelberger sustained a lung puncture and was required to undergo emergency procedures to save her life and subsequently required to be treated in the intensive care unit for eight days. We find that the award of $50,000 here did not exceed a maximum amount which the evidence will support. This amount will fairly and reasonably compensate plaintiff for the injuries she sustained. *Graeff v. Baptist Temple of Springfield,* 576 S.W.2d 291, 309 (Mo.1978).

As to whether a remittitur is proper in this case, we are mindful of the fact that this point was raised before the trial court and overruled. Such a decision is only subject to reversal upon a showing of an abuse of the trial court's discretion. *Morris v. Israel Brothers, Inc.,* 510 S.W.2d 437, 447 (Mo.1974). It is axiomatic that in reviewing the excessiveness of a verdict, only the evidence favorable to the plaintiff will be considered. *Woodford v. Illinois Central Gulf Railroad Company,* 518 S.W.2d 712, 718 (Mo.App.1974). Considering the broad discretion allowed the jury in fixing the amount of the award, the fact that the trial court approved the verdict, and viewing the evidence in the light most favorable to plaintiff, we cannot conclude that the trial court abused its discretion in failing to order a remittitur.

Judgment affirmed.

SNYDER, P.J., and KAROHL, J., concur.