Clarence James AIKEN, by his Guardian and Curator, Alene Aiken, Appellant,

v.

William F. CLARY, Respondent.

No. 50792.

Supreme Court of Missouri, Division No. 2.

Dec. 13, 1965.

John B. Newberry, and John Lewis, Springfield, for appellant.

Irving W. Schwab, Thomas D. Dwyer, Keith V. Williams, Springfield, for respondent.

FINCH, Judge.

Plaintiff went to trial on Count III of a malpractice action wherein he alleged negligence of defendant in failing sufficiently to advise plaintiff of the hazards and risks involved in insulin shock therapy to enable plaintiff to give an informed consent for the treatment. Plaintiff alleged that as a result of such therapy administered by defendant he was caused to lapse into a coma and to suffer organic brain damage, resulting in total disability. He sought recovery of $150,000. The jury returned a verdict for defendant. After an unavailing motion for new trial, plaintiff appealed to this court.

Plaintiff seeks a new trial on these grounds: (1) That the court erred in sustaining defendant's objection to plaintiff asking the jury panel on voir dire examination whether any of them were officers, agents, employees or stockholders of the Medical Protective Company of Fort Wayne, Indiana, a company which it was stipulated had an interest in the outcome of the case; (2) that there were errors committed in the giving and refusing of certain instructions, as detailed in the motion for new trial, and (3) that there was no evidence in the record on which a verdict for defendant could be based, and hence the verdict was against the weight of the evidence.

In response thereto, the defendant, in addition to specific contentions on these three particular assignments of error, claims that such alleged trial errors were immaterial for the reason that plaintiff failed to make a submissible case for the jury. Accordingly, we first consider that contention on the theory that if correct it would dispose of the case. We proceed, therefore, to examine the evidence, which, insofar as pertinent to this assignment and viewed most favorably to plaintiff, was as follows:

After military service from 1941 to 1945 plaintiff entered employment of the Frisco Railroad, ultimately serving as an electrician in the diesel engine department. Early in 1961 plaintiff became irritable and "changed almost his entire personality."

He was cross with the children, particularly a teen-age daughter, spent money on things for which he had never spent money before, and had trouble sleeping so that he lost a great amount of sleep and rest. His wife discussed with him the matter of seeing a doctor, but he maintained that his wife needed a doctor as much as he did, and that it was she who was "way out in left field." He agreed to see a doctor if she would, and they then consulted Dr. Lewis E. Jorel of Springfield, who previously had treated their daughter.

Following conferences by the doctor with both plaintiff and his wife, plaintiff entered St. John's Hospital at Springfield, Missouri, on June 3, 1961, for a complete physical examination. Numerous tests and procedures were utilized, as a result of which Dr. Jorel found no physical ailments. Dr. Jorel then discussed with plaintiff a need for psychiatric examination and arranged for defendant, Dr. William F. Clary, to examine and talk to plaintiff and evaluate him for psychiatric help. Dr. Clary testified that this examination was made and, among other things, related that plaintiff charged his wife with infidelity but in their conversation had no evidence or basis for such charge, and the doctor was convinced that this was a figment of his imagination. Dr. Clary's diagnosis was that plaintiff was a paranoid schizophrenic, and he recommended to plaintiff that he have both electric and insulin shock therapy. Plaintiff at that time said that he would think about the matter of such treatment, and Dr. Clary said he would talk further to Dr. Jorel. Thereafter, Dr. Clary talked to Dr. Jorel of his diagnosis and recommendation, and also talked to plaintiff's wife. She testified that Dr. Clary told her that plaintiff was a very sick man, that he needed treatment, but Dr. Clary didn't think plaintiff would submit thereto himself. She said that Dr. Clary suggested that they see if they could talk plaintiff into taking the treatment and if not that proceedings be started to force the treatment since he thought plaintiff was that sick.

Meanwhile, plaintiff talked to his wife and to Dr. Jorel and plaintiff told him that he wanted to take the treatment and would take it willingly. Subsequently, Dr. Clary had a second conversation with plaintiff about coming down to the psychiatry section and having a course of electric shock and insulin therapy.

With respect to the information given by Dr. Clary to plaintiff in these conversations as to the nature of the treatment and the risks involved, plaintiff offered in evidence certain statements of the defendant given in an earlier deposition. That testimony was as follows:

"Q. When you talked to him previous to the moving down to psychiatry and signing the release, did you tell him what the possible effects of insulin shock therapy might be?

"A. I told him it would put him to sleep, I told him there was risks involved, I told him the same thing about electric shock therapy. I didn't belabor the point, I told him it was risky because this guy was real shook, but I told him it was risky, and he had no questions.

"Q. Did you tell him it might possibly result in his death?

"A. I implied it. In talking about the anesthetic, I said people take anesthetic, and there are hazards. Some people over-react to anesthetics, and insulin, I told him, it is like being put to sleep, there are risks involved. In terms of specifically telling him, 'This can kill you,' no, sir, I didn't.

"Q. Did you tell him it might possibly result in a delayed awakening, possible brain damage?

"A. No, I didn't tell him that."

Dr. Clary testified that he thought the plaintiff had the mental capacity at least to understand the ordinary affairs of life, understand what the treatment really was and what it might do to him. He again related what he had told plaintiff and

stated that he tried to explain it to him on a level he would understand, and he thought plaintiff knew exactly what he was getting into. At the second conference between Dr. Clary and plaintiff, the latter agreed to take whatever treatment Dr. Clary recommended.

Accordingly, on June 9, 1961, a nurse in the psychiatric ward presented to plaintiff a form of "Consent to Shock Therapy." It read as follows: "I (We) hereby request and authorize Dr. Clary and whomever he may designate to assist him, to administer insulin and/or electroshock therapy to Mr. Aiken; and to continue to administer such therapy and such other supplemental treatment as he may deem advisable from time to time. The effect and nature of shock and/or insulin treatment have been fully explained to me (us), as well as the hazards involved. Notwithstanding the fact that there are risks to the patient inherent in this treatment, I (we) voluntarily accept the risks involved. No assurance has been made by anyone with respect to the results that may be obtained. I have been given a copy of the pamphlet 'Information to Relatives.'" The nurse testified that she did not explain anything about the dangers involved in the therapy when she presented the consent for signature. The plaintiff read the consent in her presence and she asked him if he had any questions, but he had none and he signed the consent.

Beginning on June 12, 1961, and continuing through June 22, 1961, plaintiff was given a series of shock treatments which involved insulin in increasing amounts of from 40 to 260 units. On June 22, 1961, plaintiff went into a deep coma. He suffered a delayed awakening from the insulin and did not respond to the procedures used for the purpose of bringing the patient out of the coma. A specialist in internal medicine was called in and plaintiff was transferred to the intensive care unit but the coma was prolonged and as a result plaintiff suffered brain damage.

Dr. Robert L. Lam, M.D., a specialist in neurology and psychiatry, testified for plaintiff that from an examination made by him at the Veterans Hospital in Little Rock, Arkansas, on January 16, 1964, his opinion was that plaintiff had severe organic brain damage, that he was totally incapacitated in terms of employment and that his condition was permanent as a result of the prolonged insulin coma. Plaintiff was still in the Veterans Hospital at the time of trial.

Dr. Lam was interrogated as to dangers in insulin shock therapy and he testified that the possible dangers or complications thereof are coma and death or prolonged coma resulting in various degrees of brain damage, or that there might be the production of epilepsy or localized paralysis, or there might be a vascular disturbance. In addition, he said that with convulsions that may occur one could have fractures of certain types, either of the vertebrae or the extremities. The doctor was not asked and did not undertake to testify as to the frequency of occurrence of such events, or any of them, and said that no doctor could predict which patient would be the one to have trouble, saying, "So that the only thing one can say is that, when one has a patient getting deep coma insulin, that there is a possibility that this could occur." Dr. Lam also testified that there was nothing improper in the administration of the insulin shock therapy and that the administration thereof was according to good medical practice. Dr. Lam was not asked about the adequacy of defendant's disclosures to plaintiff.

On this question of the dangers from insulin shock therapy, the plaintiff also offered a portion of a deposition of the defendant, as follows:

"Q. Doctor, would you characterize insulin shock therapy as a procedure that has inherent dangers to the patient it is given to?

"A. It has some risks; it has some risks.

"Q. What are those risks, what can happen?

"A. Well, what can happen, the main problem in insulin therapy is that if you—insulin is a funny drug, a person can react to it, and a certain point is reached, sometimes you get what we call delayed awakening. This is the major complication of insulin therapy, and every psychiatrist who has used insulin will say it is. You can go ahead and use the emergency procedure for delayed awakening, which involves giving whole blood and reverse the delayed awakening, and the patient will come out fine. We have had that occasionally, very rarely you get a situation where coma is prolonged, and no matter what you do, you can't reverse the coma, and then undesirable effects do happen. If a person is in a coma a long time, he can get some cortical brain damage."

Defendant first asserts that plaintiff failed to make a submissible case because he failed to offer any expert medical evidence as to what a reasonably careful and prudent physician engaged in similar practice would do under the same or similar circumstances with respect to disclosure of risks involved in the proposed therapy. There is no dispute but that plaintiff did not offer any expert testimony on this matter of what a reasonably prudent practitioner would disclose. We must determine, therefore, whether plaintiff is required to offer such proof in order to make a submissible case.

■ The basic philosophy in malpractice cases is that the doctor is negligent by reason of the fact that he has failed to adhere to a standard of reasonable medical care, and that consequently the service rendered was substandard and negligent. In our judgment, this is true whether the alleged malpractice consists of improper care and treatment (the usual malpractice case) or whether it is based, as here, on an alleged failure to inform the patient sufficiently to enable him to make a judgment and give an informed consent if he concludes to accept the recommended treatment.

■ How, then, is a jury to determine whether a physician has been negligent in failing to inform his patient adequately to enable him to make an informed decision whether to consent to recommended treatment? What proof must a plaintiff offer? Obviously, in addition to evidence as to plaintiff's condition and the treatment proposed and administered, there must be testimony as to what risks are involved and what disclosures were made by the doctor. These necessarily are a part of plaintiff's case. Such evidence was offered by plaintiff in this case. The real issue here is whether plaintiff is required to go further and as a part of his case offer evidence as to. a standard of medical conduct with reference to disclosures by the physician to his patient or whether this is a matter which the jury may decide without such expert testimony. There are cases from some states which hold that such expert testimony is necessary as a part of plaintiff's case [1] and cases from other states holding that such evidence is not required.[2] Plaintiff asserts that Missouri is in this latter group because this court, in the case of Mitchell v. Robinson, Mo., 334 S.W.2d 11, 79 A.L.R.2d 1017, held that expert medical testimony was not necessary for the jury to pass upon the alleged failure of the doctor to warn of the hazards of shock therapy. Counsel says that he relied thereon in not offering any expert testimony on the standard for disclosure by a physician. The factual situation in the Mitchell case was different from that here, plaintiff there contending that the doctors made *no* disclosure of risks and the doctors testifying that they did make *full* disclosure to the

1. Examples of cases so holding are Williams v. Menehan et al., 191 Kan. 6, 379 P.2d 292; Di Filippo v. Preston, 3 Storey 539, 53 Del. 539, 173 A.2d 333, and Govin v. Hunter, Wyo., 374 P.2d 421.

2. Example of case so holding is Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520.

patient. It is true that this court specifically held under those facts that no expert testimony was required as a part of plaintiff's case and that, based on frequency of occurrence of such fractures as disclosed by the evidence, there was a definite duty to inform the patient of the risks involved, the breach of which was negligence. The question of whether expert medical evidence would be required in other alleged inadequate disclosure cases with different factual situations was not specifically stated, but the court did state, 1. c. 16, in referring to the case of Steele v. Woods, Mo., 327 S.W.2d 187, as follows: "This case, Steele v. Woods, does not explicitly hold that it is the duty of a doctor to warn his patient of the hazards of a proposed treatment but there is a lesson in the case and its plain implications are certainly no comfort to the doctors here." The inference therefrom is possible that such proof would not be required.[3]

 We have reexamined this question and have concluded that the question of what disclosure of risks incident to proposed treatment should be made in a particular situation involves medical judgment and that expert testimony thereon should be required in malpractice cases involving that issue. The question to be determined by the jury is whether defendant doctor in that particular situation failed to adhere to a standard of reasonable care. These are not matters of common knowledge or within the experience of laymen. Expert medical evidence thereon is just as necessary as is such testimony on the correctness of the handling in cases involving surgery or treatment. In Fisher v. Wilkinson, Mo., 382 S.W.2d 627, 632, we held:

"Without the aid of expert medical testimony in this case a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances." And, as we said in Pedigo v. Roseberry, 340 Mo. 724, 736, 102 S.W.2d 600, 607: "Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury * * * [or an illness] was negligent notwithstanding, for instance, the uncontradicted competent testimony establish[ing] that the uniformly adopted practice of the most skillful surgeons [or physicians] had been followed." The question is not what, regarding the risks involved, the juror would relate to the patient under the same or similar circumstances, or even what a reasonable *man* would relate, but what a reasonable *medical practitioner* would do. Such practitioner would consider the state of the patient's health, the condition of his heart and nervous system, his mental state, and would take into account, among other things, whether the risks involved were mere remote possibilities or something which occurred with some sort of frequency or regularity. This determination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed. (Defendant in this case testified that plaintiff was "real shook.") After a consideration of these and other proper factors, a reasonable medical practitioner, under some circumstances, would make full

3. For example, in 60 Columbia Law Review 1193, 1197, it is stated: "Furthermore, it may be argued that the Mitchell case impliedly adopted a different limitation, because language in the case may be interpreted to mean not only that it is a jury question whether any disclosure was made at all, but also that the jury is permitted to resolve conflicts of lay testimony concerning whether in a given case it is negligent not to disclose." See also 27 Missouri Law Review 87; Washington University Law Quarterly, June 1962, p. 414; 109 Pennsylvania Law Review 768; Harvard Law Review, Vol. 75 (1961–1962), p. 1445; 37 Colorado Law Review 182; 40 Minnesota Law Review 877, and 41 Minnesota Law Review 381, for discussions of the Mitchell case and of this question of informed consent.

disclosure of all risks which had any reasonable likelihood of occurring, but in others the facts and circumstances would dictate a guarded or limited disclosure. In some cases the judgment would be less difficult than in others, but, in any event, it would be a medical judgment. In malpractice cases involving surgery or treatment the fact that the procedure or the operation is simple, rather than difficult and complex, does not eliminate the requirement that a plaintiff offer expert testimony that the procedure followed constituted a failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession in good standing practicing in similar localities.[4] Plaintiff would be required to offer such expert testimony in order to make a submissible case.[5] Likewise, in our judgment, it is not possible in cases dealing with alleged failure to make adequate disclosure to say that there must be expert medical testimony in more serious cases as to what a reasonable medical practitioner would have done, but that such proof is not required in less complicated cases. Such a

distinction is suggested in some of the writing on this subject, but we do not subscribe thereto. Accordingly, we hold that plaintiff, in order to sustain his burden of proof, is required to offer expert testimony to show what disclosures a reasonable medical practitioner, under the same or similar circumstances, would have made, or, stated another way, that the disclosures as made by the defendant do not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances. To whatever extent Mitchell v. Robinson, Mo., 334 S.W.2d 11, 79 A.L.R.2d 1017, is inconsistent with the views herein expressed, it is disapproved.[6]

■ Once plaintiff has offered sufficient proof to make a submissible case, including the required expert testimony which we have discussed, then the ultimate determination of whether defendant did or did not fail to disclose to plaintiff in accordance with the standard of what a reasonable medical practitioner would have done is a jury question under proper instructions from the court. Instructions

---

4. This is the language used in Instruction No. 11.06 of Missouri Approved Jury Instructions.

5. Exceptions do exist in some cases such as those where the doctor has left foreign objects in operative cavities, such as Null v. Stewart, Mo., 78 S.W.2d 75, or in those cases where the doctor admitted using an impractical method which would produce an unsatisfactory result, such as Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1, or where the doctor admitted that the average or reasonable practitioner would have advised as to the need of an operation, as in Steele v. Woods, Mo., 327 S.W.2d 187. In the great majority of cases a submissible case may be made only if expert medical testimony is introduced. See Williams v. Chamberlain, Mo., 316 S.W.2d 505, and Fisher v. Wilkinson, Mo., 382 S.W.2d 627.

6. Conceivably it might be argued that in the Mitchell case the doctors, by warning the patient in great detail of the dangers and risks of the treatment, as they testi-

fied they did, recognized that a reasonable medical practitioner would have made such full disclosure and thereby waived expert testimony thereon. On such a basis the case is not necessarily inconsistent with the decision herein, but to the extent that Mitchell holds or implies that expert medical testimony is not required in informed consent cases where there is no waiver, it is disapproved. —

Steele v. Woods, Mo., 327 S.W.2d 187, was quoted and relied on in Mitchell v. Robinson in holding that expert testimony was not necessary in that case. The Steele case involved the need for expert testimony to establish whether a doctor had complied with a duty to advise treatment, admittedly necessary, under a given state of facts. Where defendant recognized a duty to inform and that a reasonable practitioner would have done so in that situation, there was no need for expert testimony to so establish. Steele is not in conflict with our ruling herein, and should not be so construed.

for malpractice cases involving procedures as set out in Missouri Approved Jury Instructions can be modified to fit a case of alleged insufficient disclosure.

In view of the fact that plaintiff made no offering of any expert testimony relative to the extent of disclosure a reasonable medical practitioner would have made under the same or similar circumstances, he failed to make a submissible case for the jury. However, we will not affirm this case on that basis for the reason that counsel for plaintiff asserted in the presentation of the case that in the case of Mitchell v. Robinson, supra, this court had stated that expert testimony is not necessary in cases involving extent of duty to warn, and that he relied thereon in offering no proof of that character. In the light of language used in the opinion of Mitchell v. Robinson, supra, it was reasonable for counsel to assume the lack of a requirement of such testimony in this case. Under those circumstances, plus the fact as hereinafter set out that error was committed in limiting the voir dire examination, we feel compelled to reverse and remand for a new trial in order to afford plaintiff an opportunity to offer expert testimony on the standard of disclosure required.

Defendant next contends that plaintiff did not make a submissible case because there was no proof of the frequency of occurrence or incidence of any of the risks connected with insulin shock therapy, and hence plaintiff failed to disclose any duty to warn. Such testimony certainly is pertinent to the duty to warn, but, in the final analysis, the test, as hereinabove indicated, is what a reasonable medical practitioner would do under the same or similar circumstances. Undoubtedly, this matter of frequency of occurrence and extent of the danger would be factors considered by doctors in their testimony as to what a reasonable medical practitioner would do under the same or similar circumstances and should be offered, but we do not believe that the establishment of a submissible case by plaintiff depends on expert testimony on behalf of the plaintiff establishing extent of the danger and frequency of occurrence so long as there is proof, as here, that bad results such as prolonged coma and brain damage do result sometimes and are not mere rare or remote possibilities.

Finally, defendant contends that plaintiff did not make a submissible case in the absence of proof that plaintiff would not have consented to the insulin shock therapy if he had been informed adequately of the risks involved. Such testimony is not required, and this contention is overruled. Such a requirement would make recovery impossible in the case of a patient who died or, as here, was unable to testify. This does not mean, however, that plaintiff is not required to establish a causal connection between the doctor's failure sufficiently to inform and the injury for which recovery is sought. The matter of causation still must be submitted to the jury. Obviously, if the jury was convinced from all the evidence that a more complete disclosure would have made no difference to plaintiff, and that he still would have consented to the therapy or procedure, then plaintiff has not established a right of recovery. For example, if the evidence was that the plaintiff was about to die and chances for survival were one out of ten, a jury might well conclude that a more complete disclosure of hazards involved in an operation would have made no difference to plaintiff in deciding whether to consent to an operation which, if successful, would make his survival reasonably likely. On the other hand, a jury could find from all the facts and circumstances in a particular case that had plaintiff been properly informed he would not have consented to the treatment, and this is so even though plaintiff does not specifically so testify. The submission of such causation should be in accordance with the new Missouri Approved Jury Instructions.

Plaintiff also complains specifically as to the giving and refusal of certain instructions. We see no reason to review these assignments of error inasmuch as the case will be retried and the instructions will be framed within and under the standards of the Missouri Approved Jury Instructions.

■ The remaining assignment by plaintiff which we need to consider is that the court erred in sustaining defendant's objection to plaintiff asking the jury panel on voir dire examination as to whether any members of the jury panel were officers, agents, employees or stockholders of the Medical Protective Company of Fort Wayne, Indiana. It had been stipulated at a pretrial conference that said company, "a stock company, has an interest in the defense of this suit." On the morning of trial, after receiving the jury panel, defendant filed a written objection to the voir dire examination of the jury as to whether members thereof were stockholders, officers, directors or agents of the Medical Protective Company of Fort Wayne, Indiana. Attached was an affidavit by Byron H. Somers, President of the Medical Protective Company, to the effect that the company had no stockholders, officers or directors of the company resident in Missouri, and that it had only one employee in Missouri, to-wit, one Ralph Borgmann of St. Louis, whose name did not appear on the list of prospective jurors. Defendant asserted that voir dire examination of the panel on this question could not possibly disclose any bias or interest on the part of prospective members, and would only be calculated to inform members of the jury panel of alleged insurance coverage. Mr. Somers was not present and did not testify, and there was no evidence offered in support of the objection to such voir dire examination other than the affidavit of Mr. Somers. In our opinion, it was error, on the basis of this objection and attached affidavit, to deny to plaintiff the right to make this inquiry on the voir dire. This matter occurred without any advance notice of any kind to the plaintiff, and there was no opportunity available to the plaintiff to cross-examine Mr. Somers as to the assertion of facts contained in his affidavit. In addition, the affidavit made no reference to whether members of the families of the jury panel might be stockholders, officers, directors or agents of the company. By this ruling, we do not mean to hold, and do not hold, that it would never be possible for sufficient proof to be offered to satisfy the trial court that there was no possibility whatsoever that any members of the jury panel or members of their families could be stockholders, officers, directors or agents of the insurance company interested in that particular case, but such proof should not be made by affidavit, depriving the plaintiff of an opportunity to cross-examine. Such proof would have to be sufficient to satisfy the trial court that there was no possibility that a member of the panel or his family could be a stockholder, officer, director or agent of the insurance company, that questions relating thereto could serve no useful purpose and that such questions could not be asked in good faith. The proof offered in support of the objection in this instance was insufficient, and it was error to deny to plaintiff the right to so interrogate the jury panel on the voir dire.[7]

The judgment is reversed and the cause remanded for a new trial.

All of the Judges concur.

7. For a collection of cases holding it error to deny the right of interrogation on the voir dire under rather similar circumstances, see 4 A.L.R.2d 808.