629 F.Supp. 682 (1986)
John EAST, et al., Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 85-298C(1).
United States District Court, E.D. Missouri, E.D.
March 10, 1986.
*683 Michael S. Geigerman, Clayton, Mo., for plaintiffs.
Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
In this action, John C. East and Vera Irene East seek to recover damages for personal injuries to Mr. East and loss of consortium to Mrs. East resulting from the care provided to Mr. East by physicians of the St. Louis VA Medical Center (John Cochran).
This case was tried to the Court sitting without jury. The Court having considered the pleadings, the testimony of witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby make the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

FINDINGS OF FACT
1. John East and his wife, Irene East, were, at all times pertinent to this case, residents of the State of Missouri.
2. The defendant, United States of America, operates the John Cochran Veterans Administration Hospital in St. Louis, Missouri.
3. John East is a 62 year old male, born on September 9, 1923. Irene East is 54 years old.
4. The Easts have been married for 32 years. They have one child by their marriage and Mr. East adopted two of Mrs. East's children from a prior marriage.
5. Mr. East served in World War II in the United States Navy. He received a medical discharge in 1951, due to a broken back suffered shipboard in the Great Lakes. Because of this back injury, he is currently considered 100% disabled for purposes of disability benefits.
6. Over the years Mr. East has been treated at Cochran V.A. Hospital in St. Louis, Missouri, for a number of matters, including cancer, back pain and hearing *684 loss. These other medical problems are unrelated to the case at bar.
7. In December 1979 Mr. East was diagnosed by the V.A. Hospital as having Peyronie's disease.
8. Peyronie's disease is a disease of unknown etiology, resulting in a loss of elasticity of a portion of the tissue of the penis from plaque formation in the corpus cavernosum. The loss of elasticity causes the penis upon erection to curve toward where the plaque has formed.
9. Mr. East underwent treatment consisting of Potaba and Vitamin E. Such treatment is considered conservative, and in this case was unsuccessful.
10. The Peyronie's condition progressed to the point that in February 1982 Mr. East's penis upon erection curved to approximately an 80-85 degree angle.
11. During late 1981 and early 1982, the angle was sufficiently great to frustrate any attempts at intercourse. Mr. East stated that in addition to the inability to achieve penetration, it was painful to have an erection.
12. In January, 1982, Dr. Barton Wachs, Chief Resident in Eurology at Barnes Hospital, on rotation to Cochran V.A. Hospital, discussed the possibility of surgery with Mr. East. During these discussions, Mr. East was not told that the insertion of a penile prosthesis would be necessary.
13. The medical experts agreed that it is virtually impossible to excise or incise the plaque without removing additional materials. As a result, subsequent to surgery a patient is unable to achieve an erection without the aid of a penile prosthesis.
14. On February 8, 1982, Mr. East entered Cochran V.A. Hospital for surgery to excise the plaque that had formed.
15. On February 9, 1982, Mr. East discussed the surgery with Dr. Israel Barken. Only the excision of the plaque was discussed. No mention was made of the insertion of a prosthesis.
16. On February 10, 1982, Dr. Wachs advised the Easts that mere excision of the plaque had a very poor success rate and that he would not perform the surgery without the placement of a Small-Carrion prosthesis (a semi-rigid penile prosthesis).
17. During this period, V.A. regulations restricted the use of inflatable prostheses to veterans with service connected penile injuries. This decision was based on the relative expense of the different types of prostheses. The inflatable prosthesis cost approximately $3,000.00 while the semi-rigid type ran approximately $1,000.00. Mr. East's Peyronie's condition was not service connected. During the discussion with Dr. Wachs on February 10, 1982, the Easts were informed of the V.A. policy regarding inflatable prostheses.
18. Mr. East, upon learning the insertion of a penile prosthesis would be necessary, cancelled his scheduled surgery to reconsider the operation. He did not seek a medical opinion or advice from any physician other than those associated with the V.A.
19. On February 12, 1982, the Easts met with Dr. P. Lynn Wakefield, a staff psychiatrist, for approximately one and one-half to two hours. The parties agree that the discussions covered the fact that, if Mr. East were to have surgery involving placement of a prosthesis, he would have a permanent erection and the couple would be required to abstain from sexual intercourse for a period of six to eight weeks.
20. On February 17, 1982, John East signed two consent forms authorizing the excision of the plaque and the insertion of the Small-Carrion penile prosthesis. The authorizations do not specifically mention circumcision. Again, in discussions with Dr. Wachs, the Easts were informed of the unavailability of the inflatable prosthesis at the V.A. Hospital.
21. On February 18, 1982, Barton H. Wachs, M.D., performed the operation. He was assisted by Dr. Barken and Dr. Packer. The plaque was incised (rather than excised) and a 1.1 cm. × 14.5 cm. prosthesis was implanted in the corpus cavernosum of *685 the penis. The cavernosa are the elongated erectal tissue chambers that cause erection when engorged with blood. As a part of the operating procedure, Mr. East was circumcised.
22. In June 1982 the Easts attempted intercourse for the first time after the operation. Although successful, Mr. East complained that he experienced pain and discomfort and, as a result, discontinued all sexual intercourse.
23. On August 6, 1982, Mr. East visited Dr. Israel Barken at the out-patient clinic at the V.A. Hospital. Mr. East complained that the prosthesis was uncomfortable, and occasionally painful even when not attempting intercourse. He was also upset by the appearance of a permanent erection. Dr. Barken made a note that Mr. East's penis "seems to be short and having ST deformity." The "ST" or "SST" deformity is used to describe a condition where the head of the penis droops. Dr. Barken also noted that Mr. East was disappointed with the results and wanted the prosthesis removed.
24. Prior to the removal operation, Mr. East was informed by Dr. O'Neill and Dr. Packer that he would be impotent if a replacement prosthesis was not inserted.
25. On October 21, 1982, using local anesthesia, Dr. O'Neill, assisted by Dr. Packer, removed the prosthesis from Mr. East. Dr. O'Neill noted that the prosthesis was "at the most distal aspect subcoronally." On October 30, 1982, Mr. East was released from Cochran V.A. Hospital.
26. On February 8, 1984, plaintiff filed an administrative tort claim with the Veterans Administration in St. Louis, Missouri. On September 5, 1984, the claim was denied. This suit was timely filed.

CONCLUSIONS OF LAW
This Court has jurisdiction of this matter under 28 U.S.C. § 1346(b) and 28 U.S.C. § 2675 (1982). The United States of America is the proper defendant in this matter. Venue is proper in this district pursuant to 28 U.S.C. § 1402.
Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1982), this Court must apply the substantive law of the state where the alleged act or negligence occurred. United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963); Brown v. United States, 419 F.2d 337, 341 (8th Cir.1969). In this case, all acts relevant to plaintiffs' cause of action occurred in Missouri. Therefore, this Court must apply the substantive law of Missouri.
Plaintiffs allege three acts of negligence on the part of the staff of Cochran V.A. Hospital: first, that the hospital failed to adequately inform the Easts of the other prostheses available, specifically the inflatable prosthesis; second, that the hospital failed to adequately inform John East of the circumcision; third, that the prosthesis inserted was too short. This Court will treat each of these claims in seriatim.[1]
Under Missouri law, the failure to use "that degree of skill and learning ordinarily used under the same or similar circumstances by members of the Defendant's profession," constitutes medical malpractice. See Missouri Approved Instructions, 3d Ed. 11.06. Steele v. Woods, 327 S.W.2d 187, 196 (Mo.1959). Doctors have a duty under Missouri law to warn of risk of surgery in a manner sufficient to allow the patient to give an informed consent as to the proposed treatment. Dovthitt v. United States, 491 F.Supp. 891, 894 (E.D.Mo. 1980). Such warning is an integral part of the obligation to use ordinary skill, and failure to adequately inform is negligent. See Mitchell v. Robinson, 334 S.W.2d 11 (Mo.1960). In order to sustain their burden of proof, plaintiffs must show that the disclosures made by the staff at Cochran V.A. Hospital do not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar *686 circumstances. Aiken v. Clary, 396 S.W.2d 668, 675 (Mo.1965); Kinser v. Elkadi, 674 S.W.2d 226, 232 (Mo.App.1984).
It is clear from both his testimony at trial and his deposition that Mr. East was informed by the staff of Cochran V.A. Hospital of the existence of the inflatable prosthesis. See Findings of Fact Nos. 17 and 20. The hospital, according to the regulations in effect at the time, would not provide an inflatable prosthesis for non-service related penile injuries. See Findings of Fact No. 17. This Court rejects plaintiffs' bare assertion that he would have postponed the surgery at the V.A. had it been specifically disclosed that the inflatable prosthesis would be available should he wish to have the surgery performed at a private hospital at his own expense. Upon learning that a prosthesis would be inserted, Mr. East cancelled his first scheduled surgery to reconsider his options. See Findings of Fact No. 18. During his required conference with Dr. Wakefield, a staff psychiatrist, he was told that the inflatable prosthesis was not offered because of its expense. At no time did he seek a second medical opinion or advice from any physician, other than those connected with Cochran V.A. Hospital. This Court rejects plaintiffs' argument that defendants were required to do more.
Furthermore, implicit in plaintiffs' argument is the assertion that the semi-rigid prosthesis is inferior to the inflatable prosthesis. That is not necessarily true. While the semi-rigid model results in a permanent erection, it does not suffer from the high failure rate which accompanies the inflatable model. Dr. Boyarsky testified that the inflatable prosthesis suffered breakdowns in 30% to 50% of the cases. Clearly, a treating physician must consider the effect of possible multiple operations on each particular patient. The testifying physicians indicated that the inflatable prosthesis was generally used more on young men who, at that stage in life, tended to suffer more emotionally from just the appearance of a permanent erection. In such cases, relieving some of the emotional trauma and embarrassment was worth the risk of additional operations to repair or replace a failed prosthesis. The mere fact that the inflatable prosthesis does not result in a permanent erection, however, does not mean it is superior. In fact, there is widespread use of the semi-rigid prosthesis by every expert who testified in this case. As previously stated, the test is what a reasonable medical practitioner would do under the same or similar circumstances. In light of all the evidence, this Court cannot say that the extent of disclosure to Mr. East concerning the existence of the inflatable prosthesis was a breach of the duty of informed consent.
There is disputed testimony over whether or not Mr. East was informed that he would be circumcised during this operation. This Court finds, however, that even assuming the circumcision was never discussed with plaintiff, this does not give rise to a breach of the duty of informed consent. This Court concludes, after hearing all the evidence, that Mr. East and his wife sought primarily the ability to resume normal sexual activity. There is no indication from the testimony of any witness that, had Mr. East been informed that circumcision would be necessary, he would have refused the operation. A more complete disclosure would have made no difference to Mr. East. He still would have consented to the procedure, and therefore has no right to recovery under this claim. Aiken v. Clary, 396 S.W.2d 668, 676 (Mo.1965). Nor have plaintiffs demonstrated that circumcision was unnecessary in this case. This Court credits the testimony of Dr. Gregory and Dr. Boyarsky that circumcision is necessary to avoid postoperative complications such as infection and swelling which can lead to the loss of vascularity. Even plaintiffs' own expert, Dr. Brownstein, testified that, while he did not normally perform a circumcision in connection with this type of operation, many medical experts believed it should be done.
Plaintiffs' final claim is that the prosthesis was too short. This Court finds that plaintiffs have failed to establish defendant's *687 negligence with respect to the size of the penile prosthesis. The burden is on the plaintiffs to prove negligence on the part of defendants in failing to exercise the requisite degree of care and skill. The mere fact that there was an unexpected or bad result is, in and of itself, insufficient to impose liability. Swope v. Printz, 468 S.W.2d 34, 39 (Mo.1971); see also Hart v. Steele, 416 S.W.2d 927, 931 (Mo.1967) ("In an action for malpractice based on specific negligence no presumption of negligence is indulged in by reason of an adverse result from medical treatment."). While Dr. Barken noted that the prosthesis "seem[ed] short", see Findings of Fact No. 23, when the rods were removed, Dr. O'Neill noted that they fit into the glands. See Findings of Fact No. 25. While there exists considerable doubt whether the prosthesis was too short to begin with, even assuming arguendo this was true, this Court cannot say that defendant's conduct was negligent. This Court credits the testimony of Dr. Barken who stated that it was not uncommon to be required to change sizes. Experts for both sides admitted that some patients experience a change in anatomy over time which requires a change in the size of the prosthesis. Moreover, upon arousal, there is some change in the size of the glands. This may be, on some patients, significant enough to cause a drooping of the head. Dr. Gregory indicated that it was his experience that approximately one-fourth of the patients who received penile prostheses have some drooping or "SST" syndrome. In addition, the testimony appears consistent on the point that too long a prosthesis may have more serious consequences than one too short. Finally, further attempts to determine whether a longer prosthesis was necessary were halted by Mr. East's insistence that the prosthesis be removed.
The plaintiffs assert a general claim that the staff at Cochran V.A. failed to adequately inform them of the pain involved, the risks, the possible loss of sensation and the ultimate effect on their ability to engage in normal sexual relations. This Court finds that such claims are founded not on inadequate information supplied by the defendants' employees, but on unreasonable expectations on the part of plaintiffs. The Easts hoped the operation would return their lives to normal in all respects. That was not possible. The Easts were informed that a prosthesis was necessary to restore the ability to have sexual intercourse. With the operation and insertion of a prosthesis, come certain risks and drawbacks. This Court finds that the Easts were adequately informed concerning all aspects of the surgery. While this Court sympathizes with plaintiffs' plight, it cannot award damages for disappointment, unless accompanied by a breach of duty on the part of defendants. This Court has found no such breach. Accordingly, plaintiffs shall recover nothing on their petition.
NOTES
[1] There is no allegation by plaintiffs of negligence with respect to improper surgical procedure on the part of the hospital staff.