John WILKERSON and Betty Wilkerson, Appellants,

v.

MID–AMERICA CARDIOLOGY and Gary Beauchamp, M.D., Respondents.

No. WD 49503.

Missouri Court of Appeals, Western District.

July 25, 1995.

692

G. Spencer Miller, Larry Marske, Thomas W. Koelling, Kansas City, for appellants.

Frank Saunders, Jr., Robert Mintz, Kansas City, for respondents.

Before KENNEDY, P.J., and SMART and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

John and Betty Wilkerson (Plaintiffs) appeal the trial court's grant of a directed verdict at the close of Plaintiffs' evidence in favor of Mid–America Cardiology and Dr. Gary Beauchamp (Defendants) on the issues of consent and informed consent and the trial court's denial of their Motion for New Trial on these same issues. Plaintiffs claim that they produced sufficient evidence to submit their claims of informed consent and battery to the jury.

## I. FACTS AND PROCEDURAL BACKGROUND

John Wilkerson was hospitalized in Excelsior Springs on December 8, 1989, after being examined by his family physician for complaints of chest and shoulder pain. On December 11, 1989, he was transferred to St. Luke's Hospital.

Mr. Wilkerson was initially seen at St. Luke's on December 11 by Dr. Jodie Rowland, a noninvasive cardiologist.[1] She and 12 other cardiologists were employed by Defendant Mid–America Cardiology Association, P.C. (Mid–America). After examining Mr. Wilkerson, Dr. Rowland determined that Mr. Wilkerson had a history of classic accelerating angina and recommended that he undergo a diagnostic coronary angiogram.

Prior to performance of the diagnostic angiogram on December 12, 1989, Dr. Rowland spoke with Mr. and Mrs. Wilkerson concerning the risks of the angiogram and documented this conversation in Mr. Wilkerson's medical records. Mr. Wilkerson also signed a consent form for the angiogram.[2] Later that same day, Dr. Rowland examined the angiogram. It revealed blockages in Mr. Wilkerson's coronary arteries, the most serious of which was an approximate 98% blockage on the right side. Dr. Rowland went to Mr. Wilkerson's room to discuss the results with the Wilkersons. The nature and extent of the discussions between Dr. Rowland and Mr. and Mrs. Wilkerson are disputed.

Mrs. Wilkerson testified that Dr. Rowland stated that Mr. Wilkerson had narrowing or blockage of the arteries and that the way to correct this blockage would be to undergo an angioplasty. Mrs. Wilkerson testified that Dr. Rowland did not finish her conversation with them on December 12, 1989, however. Rather, because of the number of visitors in the room she told them that she would return later. According to Mrs. Wilkerson, Dr. Rowland instructed them to write down any questions they might have so that she could later discuss these questions with them.

Mr. and Mrs. Wilkerson and their daughter testified that Dr. Rowland never returned on December 12, 1989. She did visit Mr. Wilkerson's room the next day, December 13, 1989, but did not then discuss the angioplasty procedure or the risks associated with the procedure or any alternative treatment options because she was called away to attend to an emergency.

Mrs. Wilkerson testified that she knew the doctor planned to perform some procedure on December 14, 1989, but she did not know what one. Both of the Wilkersons' daughters testified that they understood Mr. Wilkerson would be undergoing an angioplasty on the morning of December 14. Mr. Wilkerson and his daughter testified that a nurse came to his room on December 14, 1989, and asked Mr. Wilkerson to sign a consent form for an angioplasty. Mr. Wilkerson told the nurse that no one had explained the angioplasty procedure to him. The nurse then recommended, and Mr. Wilkerson agreed, that he not sign the form until someone had talked with him about the procedure.

1. Noninvasive cardiologists interpret test films, perform noninvasive procedures and prescribe medication/treatment. An invasive cardiologist performs diagnostic and therapeutic testing, such as angiography and angioplasty.

2. The rules and regulations of St. Luke's Hospital require that consent forms be completed for any surgical or invasive procedures performed on patients. Mid–America's standard practices require that a notation be made in the physician progress notes portion of the patient's medical chart evidencing a physician-patient discussion regarding the risks and benefits of any proposed invasive procedure. Mid–America's standard practices also require that a patient sign a consent form acknowledging that informed consent had been made and that the patient's questions have been answered. The signed consent form is then placed in the hospital record.

As he was being taken to the Catheterization Lab ("Cath Lab") where the angioplasty was to be performed, Mr. Wilkerson told the staff members that he had not signed a consent form for the angioplasty procedure because it had not been explained to him. The orderly accompanying him responded that the procedure would probably be explained to him at the Cath Lab. Mr. Wilkerson could not recall if he knew why he was being taken to the Cath Lab. However, he did not think any procedure would be done until he had signed a consent form. Shortly after reaching the Cath Lab, Mr. Wilkerson was given Valium.

Mr. Wilkerson testified that Dr. Gary Beauchamp, an interventional, or invasive, cardiologist, introduced himself in the Cath Lab just before the angioplasty was performed. Dr. Beauchamp did not ask Mr. Wilkerson if he had any questions about the procedure. Furthermore, Dr. Beauchamp admitted that he did not advise Mr. Wilkerson of the risks of the angioplasty procedure, because he assumed someone else had already done so.

Dr. Rowland testified that she discussed the angioplasty and other possible therapeutic options with Mr. and Mrs. Wilkerson on December 12, 1989, after the angiogram and that she discussed them again on December 13, 1989, with Mr. Wilkerson. While Dr. Rowland stated that her first note in Mr. Wilkerson's medical records for December 12, 1989 indicated that she had discussed the risks and benefits of the angioplasty and surgery with Mr. Wilkerson, the notes, in fact, do not reflect a discussion of the procedure. In addition, the prepared written consent form for the angioplasty was never signed by Mr. Wilkerson or anyone on his behalf.

Dr. Beauchamp performed an angioplasty on Mr. Wilkerson on December 14, 1989. During the course of the angioplasty, Mr. Wilkerson's left main artery was inadvertently dissected, resulting in decreased cardiac output and cardiac arrest. Mr. Wilkerson was rushed to surgery where an emergency

bypass grafting procedure was performed. Mr. Wilkerson survived the dissection, cardiac arrest and emergency open heart surgery, but sustained permanent brain damage as a result of his cardiac arrest. Mr. Wilkerson was discharged from St. Luke's on January 2, 1990.

Plaintiffs brought suit against Mid–America and Dr. Beauchamp. In their Petition, Plaintiffs alleged negligent care and treatment by Defendants, including failure to explain the options and risks associated with the angioplasty procedure and failure to obtain Mr. Wilkerson's consent for the procedure. They also alleged battery resulting from physical contact with Mr. Wilkerson without his consent.

Defendants' expert, Dr. Jay Murphy,[3] testified that the accepted practice in obtaining consent is for the physician to explain the treatment options and the risks and benefits of those options to the patient and to then obtain consent from the patient to proceed. He agreed that a physician's failure to advise a patient of the risks of a particular procedure falls below the applicable standard of care. Dr. Murphy stated that angioplasty is an alternative treatment to bypass surgery, that dissection of an artery is a generally accepted complication of angioplasty and that dissection could lead to cardiac arrest. He specified that the risk of acute occlusion of a vessel from dissection was 3–5% and the risk of dissection itself was approximately 5%.

Plaintiffs' expert, Dr. Jay Schapira, stated that the patient must understand the reason, options, indications and risks and complications of a procedure as well as the chances of success so that the patient can decide whether they should have a particular procedure done. Dr. Schapira stated that, in a patient like Mr. Wilkerson, there was a substantial chance that the angioplasty procedure would be unsuccessful and that the patient should be alerted to the substantial chance that if the angioplasty were unsuccessful, bypass surgery might still be required.

3. Dr. Murphy appeared out of order due to scheduling conflicts. His testimony was taken during the presentation of Plaintiffs' evidence.

Dr. Rowland testified that the other secondary risks associated with angioplasty included cardiac infarction, heart attack, death, emergency bypass, stroke and hemorrhage. Dr. Rowland also testified that there were four treatment options available to Mr. Wilkerson for his heart condition—doing nothing, treatment by medication, angioplasty and non-emergency bypass surgery. Drs. Murphy and Schapira both testified that only two treatment options were available to Mr. Wilkerson—coronary artery bypass surgery and multivessel coronary artery angioplasty.

Dr. Beauchamp testified as to the differences between a planned bypass procedure and an emergency bypass procedure, such as Mr. Wilkerson was required to have following dissection of his artery during the angioplasty. Such differences include the amount of time both the surgeon and the anesthesiologist have in which to prepare for the procedure. With a planned bypass procedure, the surgeon and anesthesiologist could consult with the patient several days in advance of the surgery and have ample time to review records, films, videotapes as well as information provided by other treating physicians. However, in the case of an emergency bypass, this preparation time would be limited to a matter of minutes. In addition, the evidence showed that St. Luke's Cath Lab where the angioplasty was to be performed was located two floors from the surgery floors where any emergency bypass would be performed.

At the close of Plaintiffs' evidence, Defendants filed a Motion for Directed Verdict on Plaintiffs' claim that Defendants performed a medical procedure on Mr. Wilkerson without his consent and without explaining the associated risks. At a hearing regarding this motion, Defendants claimed that Plaintiffs failed to produce any evidence as to what they would have done had their questions regarding the procedure been answered. Plaintiffs replied that they had produced evidence that the patient should have been advised of the risks inherent in a procedure, including the risks of death, dissection and cardiac arrest, and should have been advised of alternative treatment available to him such as, in this case, planned elective bypass sur-

gery. Plaintiffs also argued that causation in Missouri is judged by an objective standard—what a reasonable person would have done under the same or similar circumstances. Plaintiffs argued that they were not required to produce testimony by Mr. Wilkerson as to what he would have done had the proper disclosure been made.

The trial court granted Defendants' Motion for Directed Verdict on the grounds that Plaintiffs had failed to present sufficient evidence for the jury to determine the issue. The remaining issue of negligence—whether Dr. Beauchamp failed to use the proper technique in the angioplasty—was submitted to the jury. Ultimately, the jury indicated that it was deadlocked and, at Plaintiffs' request, a mistrial was granted.

Plaintiffs filed a Motion for New Trial on the issues of consent and informed consent. Following a hearing on this motion, the trial court denied Plaintiffs' Motion for New Trial and ordered the case retried without the consent issue. This appeal followed.

## II. *LEGAL ANALYSIS*

### A. *Standard of Review*

 In reviewing a trial court's order granting a directed verdict in favor of defendant, the appellate court will determine whether the plaintiff has introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery. In reaching its determination, this Court must review the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case. If reasonable minds can draw different conclusions from the facts, the questions of negligence and causation are for the jury and a directed verdict is not proper. *Eichelberger v. Barnes Hosp.*, 655 S.W.2d 699, 704–05 (Mo.App.1983). If this Court finds that substantial evidence was introduced, it will reverse the grant of a directed verdict.

### B. *Plaintiffs Made a Submissible Case on their Claim of Lack of Informed Consent*

 Plaintiffs argue that they made a submissible case on the issue of lack of informed

consent and that the trial court therefore erred in granting a directed verdict on that claim in favor of the Defendants at the close of Plaintiffs' evidence.

■■■ A cause of action for lack of informed consent has three basic elements: 1) nondisclosure, 2) causation, and 3) injury. To prove nondisclosure, the plaintiff is required to produce expert testimony to show what disclosures a reasonable medical practitioner would have made under the same or similar circumstances. Stated another way, a plaintiff must show that the disclosures made by the defendant do not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances. *Aiken v. Clary,* 396 S.W.2d 668, 675 (Mo.1965).

The parties agree that, under this standard, Mr. Wilkerson's physicians had a duty to obtain his informed consent before subjecting him to treatment and that Plaintiffs presented adequate evidence to go to the jury on the issue whether Mr. Wilkerson's physician breached the appropriate standard of care in fulfilling that duty. Defendants also admit, solely for the purpose of this appeal, that there was sufficient conflicting testimony to make a submissible case on the element of damages regarding whether Mr. Wilkerson sustained severe injuries due to the dissection of his artery during the angioplasty. Defendants assert, however, that Plaintiffs failed to make a submissible case on the remaining essential element of their informed consent claim: causation.

The exact nature of what Defendants allege is missing from Plaintiffs' proof of causation is different now than it was at the time they asked the trial court to direct a verdict for Defendants on that issue below. In the trial court, Defendants alleged that Plaintiffs were required to present evidence that, had Mr. Wilkerson received the information which a reasonable doctor would have given him, he personally would have withheld his consent to the angioplasty and the injury would have been avoided. Because Mr. Wilkerson did not testify in Plaintiffs' case as to whether he would have undergone the angioplasty if he had known of its risks and of available alternatives, there was no direct

evidence as to whether he would have withheld his consent. Defendants thus argued that they were entitled to a directed verdict on the issue of causation. It appears from the transcript and the trial court's order that the trial court granted the directed verdict based on its acceptance of this argument.

■ On appeal, Defendants admit that their argument that Plaintiffs had to show what Mr. Wilkerson personally would have done if he had received a full disclosure of the risks of the operation was incorrect. While some states apply this type of subjective standard in deciding whether plaintiff has proved causation, Missouri specifically rejected a subjective standard in favor of an objective one in *Aiken v. Clary,* 396 S.W.2d at 675. *See also* John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th 900 (1985).

The plaintiff in *Aiken* alleged that the defendant physician failed to adequately inform him of the risks of insulin shock therapy. As a result of the treatment, plaintiff lapsed into a coma and sustained organic brain damage. *Aiken* rejected the argument that, in order to prove causation, plaintiff had to testify that he would not have consented to the therapy if he had been properly informed of its risks, stating:

> The matter of causation still must be submitted to the jury. Obviously, if the jury was convinced from all the evidence that a more complete disclosure would have made no difference to plaintiff, and that he still would have consented to the therapy or procedure, then plaintiff has not established a right of recovery.... On the other hand, a jury could find from all the facts and circumstances in a particular case that had plaintiff been properly informed he would not have consented to the treatment, *and this is so even though plaintiff does not specifically so testify.*

*Aiken,* 396 S.W.2d at 676 (emphasis added).

■ Under *Aiken,* the standard for determining lack of informed consent is whether a reasonable person in plaintiff's position would have consented to the procedure had the

proper disclosure been made. If disclosure would not have changed the decision of a reasonable person in the position of the patient, then no causal connection exists between the nondisclosure and the damages. Thus, the plaintiff bears the burden of producing evidence from which a jury could determine whether a reasonable person would have consented to the procedure. *Id.*

For this reason, to the extent the trial court granted a directed verdict based on the application of a subjective, rather than an objective, standard, it erred. This error does not require remand, however, .if the trial court's decision would have been correct had it applied the appropriate, objective standard. *Girardeau Contractors, Inc. v. Missouri Highway & Transp. Comm'n,* 644 S.W.2d 360 (Mo.App.1982).

■ On appeal, Defendants claim that the grant of a directed verdict should be affirmed because it would have been correct under an objective standard. They note that all parties agree that *Aiken* required Plaintiffs (1) to present expert testimony as to what a reasonable medical practitioner would have disclosed to the patient, (2) so that the jury could determine whether a reasonable person would have consented to the procedure had such information been disclosed.

Defendants state that Plaintiffs failed to supply the evidence necessary to meet this test. Plaintiffs' experts simply testified to the risks of the angioplasty procedure itself and to the fact that a planned bypass operation and possibly medication or no treatment were available treatment alternatives to angioplasty. Defendants say that none of the experts testified as to the relative risks and benefits of these alternative treatments and that, in the absence of such testimony, the jury had no basis except speculation on which to determine whether a reasonable person would have consented to the angioplasty. Therefore, Defendants state, Plaintiffs failed

to make a submissible case and the grant of a directed verdict was proper.

Plaintiffs, in reply, deny that they failed to produce sufficient evidence of the risks associated with angioplasty and its alternatives. The experts testified that, if all went well, angioplasty was a less invasive procedure and had fewer risks. If it were not successful, however, they testified that a bypass would be needed anyway. They testified that if such a bypass had to be done on an emergency basis due to the occurrence of a dissection, or due to other recognized risks of angioplasty, the patient would be subjected to more risk of injury. In addition, the evidence showed that an emergency bypass resulting from dissection during angioplasty would have involved some delay while the patient was being moved from the Cath Lab to the surgery floor, two floors away. Such a delay would presumably not occur during a planned bypass procedure.

Plaintiffs claim that the jury could reasonably have determined, based on this evidence, that a reasonable person in Mr. Wilkerson's position would have refused to consent to the angioplasty. Plaintiffs argue that they were not required to also show the exact degree of risk of each alternative procedure or to compare the specific risks of each, and note that Defendants have not cited a single case which holds otherwise.[4]

We agree. As Plaintiffs note, none of the cases cited by Defendants hold that in order to make a submissible case of lack of informed consent a plaintiff must present expert testimony as to the details of the various risks for each and every treatment option that was potentially available to him. For instance, *Harrell v. Witt,* 755 S.W.2d 296 (Mo.App.1988), held that a jury instruction on the issue of informed consent "should include sufficient ultimate facts which conform to the plaintiff's evidence regarding the specific risks which should have been disclosed and/or the existence and feasibility of

---

4. Plaintiffs alternatively argued in their initial brief on appeal, and at argument, that no specific proof of causation is needed. They urged this Court to follow what they call the "strict liability analysis" adopted in Colorado, under which "[i]f a patient's consent to surgery is obtained without disclosure of the substantial risks inherent in the operation, the doctor is liable for any resultant injury to the patient regardless of negligence." *Miller v. Van Newkirk,* 628 P.2d 143, 146 (Colo. App.1980). For the reasons discussed in the text above, we hold that proof is required that proper disclosures would have caused consent to be denied.

specific possible alternatives to the treatment." *Id.* at 299. It found that the plaintiff had made a submissible case by presenting expert testimony that the treating physician had not met the standard of care in informing plaintiff of the surgery, its foreseeable risks and possible alternatives.[5] None of these cases state that the plaintiff fails to make a submissible case unless the expert specifically details and compares the relative risks of each procedure.

We do not believe this lack of a requirement of expert testimony as to the exact risks of each alternative treatment, beyond the testimony necessary to establish the standard of care, is accidental. The issue in an informed consent case such as this is not whether, hypothetically, the experts believe an angioplasty would in fact have been the better choice of treatment for the patient than a scheduled bypass operation if every potential risk or benefit of each alternative treatment were fully discussed and reviewed by experts. The issue was whether a reasonable person in Mr. Wilkerson's situation, provided **the information about angioplasty and other options which a reasonable doctor in the same or similar circumstances would have given him,** would have consented to the angioplasty.

A reasonable doctor would not necessarily disclose every possible alternative, nor would that doctor necessarily disclose all details about the risks associated with each alternative, however. To the contrary, as prior cases have recognized, what information a reasonable physician would give would vary depending on the circumstances, the types of risks involved, the mental and physical state of the patient, and so forth. As stated in *Eichelberger v. Barnes Hosp.,* 655 S.W.2d 699 (Mo.App.1983):

> Although the frequency of occurrence and extent of danger are factors to be considered by doctors in their testimony, the test is what a reasonable medical practitioner would do under the same or similar circumstances. The question of what disclo-

sure of risks incident to proposed treatment should be made in a particular situation involves medical judgment....

*Eichelberger,* 655 S.W.2d at 705 (citations omitted).

*Eichelberger* thus held that evidence of what risks should be disclosed is a part of the determination of the standard of care to which the physician will be held, and that in deciding that issue it may be found that the patient need not be given information as to the frequency or occurrence of particular risks. *Aiken* itself made a similar point, stating:

> Defendant next contends that plaintiff did not make a submissible case because there was no proof of the frequency of occurrence or incidence of any of the risks connected with insulin shock therapy, and hence plaintiff failed to disclose any duty to warn.... Undoubtedly, this matter of frequency of occurrence and extent of danger would be factors considered by doctors in their testimony as to what a reasonable medical practitioner would do under the same or similar circumstances and should be offered, **but we do not believe that the establishment of a submissible case by plaintiff depends on expert testimony on behalf of the plaintiff establishing extent of the danger and frequency of occurrence so long as there is proof, as here, that bad results such as prolonged coma and brain damage do result sometimes and are not mere rare or remote possibilities.**

396 S.W.2d at 676 (emphasis added).

Certainly, as Defendants note, mere proof of a breach of this standard of care and damages does not make a submissible case. To the contrary, the jury must also determine causation. However, once the jury is told what a proper warning would have consisted of, it knows what the patient would have known when deciding what course to follow, and thus it has all the information it needs to make the determination as to what

---

5. *See also Baltzell v. Van Buskirk,* 752 S.W.2d 902, 909 (Mo.App.1988) (suggesting no need to discuss risks of alternative treatments which the doctor does not plan to recommend); *Kinser v.*

*Elkadi,* 674 S.W.2d 226, 232 (Mo.App.1984) (instruction properly submitted issue whether doctor was negligent in failing to adequately inform of foreseeable risks and possible alternatives).

option a reasonable person in Plaintiff's situation would have followed.

If we accepted Defendants' argument to the contrary and required additional expert testimony on the issue of causation beyond that required to establish the standard of care, we would in effect hold that, while a patient need not necessarily be given information about all risks in order for a doctor to obtain informed consent, a jury must be given such information in order to determine whether the doctor *failed* to obtain informed consent.

Use of such a dual standard is neither workable nor logical.[6] The jury needs only to hear sufficient evidence on which to base a determination whether a reasonable person in Plaintiff's situation would have consented to a particular procedure had that person had adequate information about the procedure; the jury does not need to determine which procedure is theoretically superior or more risk-free in some hypothetical sense.[7]

Here, there was admittedly ample evidence that the information Mr. Wilkerson *was* given was inadequate. We agree with Defendants that Plaintiffs' evidence as to what information Mr. Wilkerson *should have been* given about the risks of the angioplasty and of possible alternatives to angioplasty was far less strong. We find, however, that testimony as to the risks of angioplasty and of an emergency bypass as compared to a planned bypass operation was sufficient to allow the jury to determine what a reasonable doctor would have included in an adequate warning. The deficiencies in Plaintiffs' experts' discussion of the risks of alternative options can be brought out on remand on cross-examination or in Defendants' case, and may well lead the jury to conclude that a reasonable person in Mr. Wilkerson's situation would have con-

sented to angioplasty. Those deficiencies go to weight, not submissibility, however. It was up to the jury to weigh this information and to determine whether, based on it, a reasonable person would have refused to consent to the angioplasty. While Defendants imply that a reasonable person would not do so, we cannot say that a jury would be required to reach this conclusion as a matter of law.

### C. *Plaintiffs Made A Submissible Claim of Battery due to Lack of Consent to the Performance of Angioplasty*

■■■ Plaintiffs also claim that Defendants are liable because they performed the angioplasty on Mr. Wilkerson without obtaining his consent to the performance of that procedure. Generally, a claim in battery will lie if a physician performs an operation without the patient's consent or where the operation is not the surgical procedure to which the patient gave his consent. *Hershley v. Brown,* 655 S.W.2d 671, 678 (Mo.App.1983). This is a separate and distinct claim from a claim for lack of informed consent. As discussed above, the latter claim alleges a form of medical malpractice based on the negligence of the physician in failing to meet the required standard of care in informing the patient of the risks of the treatment and available alternatives. *Baltzell v. Van Buskirk,* 752 S.W.2d 902, 906 (Mo.App.1988) (*Baltzell II* ).

■■■ Consent to medical treatment may be manifested in a number of ways: the patient may expressly consent by oral agreement or by signing a formal written permission; or the patient may give implied authority by conduct, such as by voluntary submission to the operation or by failure to object to it. 61 Am.Jur.2d *Physicians, Surgeons, and*

---

**6.** We further note that numerous experts, including an expert for Defendants who testified during Plaintiffs' case, specifically stated that a scheduled bypass operation was a valid alternative to angioplasty for Mr. Wilkerson and that he should have been informed of that option. If angioplasty were always superior, then a bypass would not have been an alternative. It is inconsistent to state that the jury could not find that Mr. Wilkerson would have chosen the bypass over the angioplasty.

**7.** *Aiken* itself supports this result. As noted *supra,* the *Aiken* plaintiff failed to offer evidence as to the incidence of certain of the risks associated with insulin therapy and the plaintiff failed to himself testify that he would not have consented to the treatment had he been adequately informed of its risks. The Court nonetheless held that a submissible case was made under the reasonable person standard adopted in that case and that the causation issue was for the jury.

*Other Healers* § 181 (1981). *See also* Annotation, *Consent as condition of right to perform surgical operation,* 139 A.L.R. 1370 (1942) (supplementing 76 A.L.R. 562 (1932)) (implied consent); Laurent B. Frantz, Annotation, *Malpractice: Questions of Consent in Connection with Treatment of Genital or Urinary Organs,* 89 A.L.R.3d 32, § 5 (1979) (same).

*Rothe v. Hull,* 352 Mo. 926, 180 S.W.2d 7 (1944), recognized that implied consent could be found where the patient gives a general authorization to the physician to act. In *Rothe,* the patient signed a general authorization and permission for the physician to use his reasonable care, skill, and judgment to correct any condition found during an appendectomy. The court approved an instruction submitting the issue whether this general authorization constituted consent to removal by the physician of additional organs which the physician determined, during the operation, needed to be removed.

There is a dispute as to whether Mr. Wilkerson consented to the angioplasty. Mr. Wilkerson's agreement to be brought to the Cath Lab for some procedure is evidence that he impliedly consented to the angioplasty. On the other hand, he states that he cannot recall if he knew why he was being taken to the Cath Lab. Mrs. Wilkerson states that she knew something was going to be done but she denies that she knew Mr. Wilkerson would be undergoing an angioplasty. Mr. Wilkerson's daughters, by contrast, state that they thought he was undergoing an angioplasty, while Dr. Rowland claims that she discussed the angioplasty with Mr. Wilkerson and that he consented to the procedure.

We find that this evidence creates a factual dispute as to whether Mr. Wilkerson expressly or impliedly consented to the angioplasty. Grant of a directed verdict on the issue of consent therefore was improper.

Defendants claim that we should nonetheless not remand for a new trial on the lack of consent issue because Plaintiffs abandoned that claim by failing to tender an instruction on lack of consent. Plaintiffs claim that they did not submit such an instruction because the trial court had already granted a directed verdict on their lack of consent claim. Defendants claim that this is not true, and that the trial court solely directed a verdict on the lack of informed consent claim. They say that Plaintiffs were simply in error in concluding that the consent claim was also directed against them, and that they waived this claim by failing to submit it to the jury.

We have reviewed in detail the portions of the transcript at which the trial court directed a verdict. It is evident that both parties were somewhat confused as to the differences between consent and informed consent, and that counsel for Plaintiffs incorrectly described a claim for lack of any consent as a negligence claim, whereas it in fact is submitted as a battery claim. However, counsel for Plaintiffs clearly argued his right to submit both lack of consent and lack of informed consent, noting that the former is proved by showing Mr. Wilkerson did not consent at all, while the latter is proved by showing that Mr. Wilkerson consented to the procedure but was not given adequate information about it.[8]

At the conclusion of the arguments the trial court stated, "I'll grant the motion for directed verdict on the consent issue at this time." Based on these events, Plaintiffs reasonably concluded that they were barred from submitting both lack of consent and lack of informed consent. They did not waive the lack of consent claim by failing to offer an instruction on it.

For the reasons stated above, we reverse the trial court's grant of a directed verdict on the claims of lack of consent and lack of informed consent, and remand the case so that a trial may be held on those claims at

---

8. We note that the factual predicates for the lack of consent claim and for the lack of informed consent claim are inconsistent, in that the former requires a finding that Mr. Wilkerson did not consent to the angioplasty or receive any warnings, while the latter presupposes consent to the angioplasty. The jury therefore should be instructed in a way which makes it clear that the battery and informed consent claims are submitted in the alternative and that they cannot come back with a verdict in favor of Plaintiffs on both theories.

the same time that the new trial is held on the remaining negligence claim as to which a mistrial was granted.

All concur.